Ryan D. Watstein (*admission forthcoming*)
Georgia Bar No. 266019
Patrick J. Fitzgerald (*admission forthcoming*)
Georgia Bar No. 405638
**WATSTEIN TEREPKA LLP**
1055 Howell Mill Road, 8th Floor
Atlanta, Georgia 30318
Telephone: 404-782-0695
ryan@wtlaw.com
pfitzgerald@wtlaw.com

*Counsel for Plaintiff PivotHealth Holdings, LLC*

# UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| PivotHealth Holdings, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>Lucas Horton,<br><br>    Defendant. | Civil Action. _____ |

## COMPLAINT

This action arises out of serial litigant Lucas Horton's wrongful institution of a civil proceeding against PivotHealth Holdings, LLC ("Pivot"), in *Horton v. PivotHealth*, Case No. 22-cv-02915 (N.D. Tex.) (reassigned to D. Ariz. as Case No. 2:23-cv-02533) (the "Underlying Action"), and his abuse of process therein. As set forth below, Mr. Horton initiated and then proceeded to litigate knowingly frivolous claims in bad faith and then forged evidence to support his claims. Mr. Horton's misconduct caused Pivot to sustain substantial damages, including the attorneys' fees and expenses defending the Underlying Action and investigating his forged evidence, the loss of employee time, and the damage

to Pivot's reputation.  Pivot initiates this action to recover those damages and to obtain injunctive relief prohibiting Mr. Horton from filing future lawsuits *pro se*.

1. Lucas Horton is a serial litigant.  Since 2020, he has filed more than 30 actions seeking damages under the Telephone Consumer Protection Act and other consumer protection laws.  In the Underlying Action, Mr. Horton alleged that Pivot called him several times, allegedly violating the TCPA, and then refused to issue him a refund for a health insurance policy he purchased pursuant to an email he allegedly sent to memberservices@pivothealth.com on October 13, 2022 (the "Refund Demand").

2. But Pivot never called Mr. Horton and it didn't sell him the subject policy. Instead, Rank Media USA, LLC ("Rank Media") made the calls on behalf of American Health Plans, LLC ("AHP"), and neither company is related to Pivot.  Mr. Horton knew that—he even initiated a lawsuit against Rank Media before suing Pivot, alleging Rank Media placed the exact same calls he would later accuse Pivot of making.  *Horton v. Rank Media USA LLC*, 3:220-cv-02476 (N.D. Tex. Nov. 4, 2022) (the "Rank Media Action"). The Rank Media Action netted Mr. Horton a generous settlement pursuant to which he released the very same claims he continued to pursue in the Underlying Action.

3. But Mr. Horton wanted more.  Accordingly, even after he was paid by Rank Media and released liability for "all solicitations listed by Plaintiff in the Lawsuit [the Rank Media Action]," he continued to claim that Pivot was somehow responsible for the very same calls and for refusing to issue him a refund, and demanded payment.  Mr. Horton knew his claims were baseless and that the Rank Media release "absolve[d] [P]ivot as well," but he continued to insist that a "jury sick of robocalls" would ultimately rule in his favor.  When Pivot refused to bend to his extortionate demands, Mr. Horton filed suit— without telling Pivot that he had already released the (frivolous) claims against it, of course. Despite the fact that he already released all liability related to the calls and despite Pivot's evidentiary motion further confirming Pivot had nothing to do with the calls and had no liability to refund the premiums he paid for an insurance policy issued by third-party

carrier, Companion Life Insurance ("Companion"), Mr. Horton persisted, foisting significant expense on Pivot.

4. Mr. Horton only relented when the undersigned confronted him with evidence that he engaged in fraud and forgery to support his claims. Namely, during discovery, Mr. Horton disclosed an email copy of the purported Refund Demand, which was captioned "October 13, 2022 at 10:29 AM *CST* [Central Standard Time]"—despite purportedly being delivered in October, during Daylight Standard Time. Pivot had no record of the Refund Demand and when the undersigned informed Mr. Horton that Pivot intended to subpoena his email carrier for his outbound email log, Mr. Horton immediately capitulated, responding that he was going to dismiss the Underlying Action with prejudice. Mr. Horton did this out of fear that having his forgery entered on the record would jeopardize his career as a serial litigant.

5. Mr. Horton then moved to dismiss the Underlying Action he filed with prejudice, which the Court granted, disposing the action in favor of Pivot.

6. As a result of Mr. Horton pursuing frivolous and released claims in the Underlying Action, along with his abuse of the discovery process, Pivot incurred tens of thousands of dollars in damages, including its defense costs, not to mention the lost employee time and the damage to Pivot's reputation by being named as a defendant in a federal action. Pivot initiates this action to recover the damages it suffered because of Mr. Horton's malicious prosecution and abuse of process, punitive damages to deter similar claims, and equitable relief barring Mr. Horton from filing future lawsuits *pro se* without permission from this Court.

## THE PARTIES

7. Pivot is an Arizona-organized limited liability company that makes short-term health insurance coverage available to individual consumers. Pivot's principal place of business is in Scottsdale, Arizona, and its sole member is Healthcare, Inc., a Delaware corporation with its principal place of business in Miami, Florida.

8. Lucas Horton, who is a Texas citizen, is a serial TCPA litigant who has filed more than 30 TCPA actions since 2020.

## JURISDICTION & VENUE

9. Venue is proper before this Court pursuant to 28 U.S.C. § 1391(b) as a substantial portion of the events giving rise to this action took place in this district. Specifically, Mr. Horton initiated a federal lawsuit against an Arizona company and then continued to litigate his frivolous claims in this district after the Underlying Action was transferred.

10. The Court has specific personal jurisdiction over Mr. Horton because the unlawful conduct at issue was directed to and intended to harm an Arizona company. Mr. Horton knew that his pursuit of the frivolous and released claims in the Underlying Action and abuse of process would injure an Arizona company. Separately, Mr. Horton continued to pursue his frivolous and released claims and disclosed the forged Refund Demand after the Underlying Action was transferred to this Court. This separately confirms that Mr. Horton purposefully directed the unlawful conduct at issue in this case to Arizona.

11. This Court has jurisdiction over this matter under 28 U.S.C. § 1332 as the parties are citizens of different states and the amount in controversy exceeds $75,000.

## BACKGROUND

**A.   Pivot's Business**

12. Pivot makes short-term health insurance coverage available to individual consumers by working with multiple insurance carriers (similar to how the American Bar Association makes group insurance policies available for lawyers to purchase). Those carriers then issue policies under the Pivot brand at a discount, and individual consumers are added to the policies as additional insureds. This spreads the risk among everyone who purchases a Pivot-branded policy, making the premiums more affordable.

13. Pivot doesn't engage in outbound telemarketing to advertise Pivot-branded policies, it doesn't sell those policies directly to consumers, and it doesn't hire others to engage in such work on its behalf.

14. Rather, independent third-party marketing organizations (*i.e.*, insurance brokers and agents), like American Health Plans, market the policies as one of several policies in the portfolio of insurance products they offer. Those brokers may recommend purchasing a Pivot-branded policy, other coverage, an individual plan through the Affordable Care Act marketplace, or no coverage at all. If the consumer applies for and purchases a Pivot-branded policy, one of several health insurance companies that Pivot associates with, like Companion Life Insurance, will then issue the policy. Pivot will then email the consumer, explaining the benefits afforded under his policy, and offer basic customer service.

15. Notably, Pivot is not involved and has no control over the brokers' sales efforts, including which consumers contact brokers, which consumers the brokers contact, the manner in which this contact occurs, or the coverage that the brokers' agents ultimately recommend. Moreover, Pivot receives no benefit from the brokers' sales, nor does it charge for or receive any portion of the brokers' commission or the individual premium the consumer pays the carrier for the policy itself.

**B.  The Facts in the Underlying Litigation**

16. The Underlying Litigation arose out of calls that Rank Media allegedly placed on behalf of American Health Plans (both of which are independent entities that aren't related to Pivot). American Health Plans retained Rank Media to make calls on its behalf and between September 6 and October 10, 2022, Rank Media allegedly called Mr. Horton 14 times (the "Subject Calls"). None of the callers mentioned Pivot and Mr. Horton never asked who they were working for.

17. On October 10, 2022, Mr. Horton, allegedly attempting to identify the caller, purchased an insurance policy from an AHP agent.

18. As it so happens, the agent recommended a Pivot-branded policy. And upon receiving his application, Companion issued Mr. Horton a health insurance policy and Pivot then sent him a welcome email, describing the benefits available under his policy.

19. On October 13, 2022, Pivot received a draft Complaint from Mr. Horton, accusing Pivot of making the Subject Calls and allegedly violating the TCPA.

### C. Mr. Horton Identifies the Caller

20. Unbeknownst to Pivot, Mr. Horton already contacted American Health Plans on October 11, 2022 and accused it of making the same calls he claimed Pivot placed. On October 13, 2022, AHP acknowledged that it placed the calls through Rank Media. Rank Media Correspondence, attached as Exhibit 1.

21. On November 4, 2022, Mr. Horton filed suit against Rank Media, alleging that it placed the Subject Calls and was liable for violating the TCPA. Rank Media Complaint, ECF No. 3 ¶ 9. Mr. Horton ultimately settled his claims against Rank Media on December 30, 2022, receiving more than $1,000 for each of the Subject Calls. Pursuant to the settlement agreement, Mr. Horton agreed to release "all solicitations listed by Plaintiff in the Lawsuit [the Rank Media Action][.]"

22. Mr. Horton never told Pivot about the Rank Media Action. On the contrary, Mr. Horton told Pivot that his settlement negotiations with Rank Media "fell through."

### D. Mr. Horton Attempts to Wrongfully Coerce a Settlement Payment from Pivot

23. After receiving his October 13, 2022 demand, Pivot contacted Mr. Horton, explained the nature of its business, and told him that it never called his phone and didn't sell him the insurance policy. And Mr. Horton acknowledged as much, stating "I have figured out who actually called me, which is who I really want to sue. They are called RankMedia." Horton Email Correspondence, attached as Exhibit 2, at 14.

24. Nevertheless, Mr. Horton continued to insist that Pivot must pay him if it wanted to avoid the expense of litigation. He therefore adopted absurd positions, including that "if Pivot receives ANY revenue from the charges made to my card [from the sale of the policy], they are liable [for the calls]," regardless of whether Pivot even knew about the calls. Horton Email Correspondence at 4; Deposition of Lucas Horton, attached as Exhibit 3, at 114:24-115:14.

25. In addition to alleged telemarketing liability, Mr. Horton claimed Pivot was liable for violating Tex. Bus & Commerce Code 301.052, which forbids persons selling "**consumer goods** [which the statute defines as real or personal property, or services related to the same, and thus excludes health insurance] through the use of a telephone solicitor" from charging a person's credit card unless they give the consumer an opportunity to return the goods and receive a refund within seven days.

26. Mr. Horton told Pivot that he asked for a refund "days after buying the policy," but Pivot told him it didn't have a record of his request and Mr. Horton refused to provide a copy. Horton Email Correspondence at 4, 6. But Mr. Horton did "not give a shit about requesting the refund correctly." Horton Email Correspondence at 3.

27. And when Pivot told Mr. Horton it couldn't be held liable for the conduct of third parties that it had no connection with, Mr. Horton deflected, stating "we can let a jury sick of robocalls decide this" and that he "would be playing with a stacked deck[.]" Horton Email Correspondence at 4. Mr. Horton likewise continued to hurl threats at Pivot, lashing out after Companion charged a premium for the policy that "You [Pivot] are only digging your own hole you stupid piece of shit. You obviously do not know the law and will find that out soon enough." Horton Email Correspondence at 6.

28. Despite continuing to make extortionate demands, Mr. Horton told Pivot that he was settling his claims against Rank Media and "they are forcing me to absolve [P]ivot as well" and that the agreement will absolve "them [Rank Media] and anyone else for the TCPA and TX 305 violations." Horton Email Correspondence at 3, 5. However, Mr. Horton later told Pivot that "the agreement with [R]ankmedia fell through." *Id.* at 2. Accordingly, Pivot did not learn about the Rank Media Action or the settlement agreement until December 2023, while defending the lawsuit that Mr. Horton was pursuing against Pivot notwithstanding his release of the claims therein.

### E. Mr. Horton Wrongfully Initiates and Pursues the Underlying Action

29. Once Mr. Horton realized that Pivot wasn't going to give in to his demands, he initiated the Underlying Action on December 29, 2022. Therein, Mr. Horton alleged

1  that Pivot made the exact same calls he previously accused Rank Media of making (and
2  subsequently settled with Rank Media over). *Compare* Pivot Complaint, ECF No. 3 ¶ 11,
3  *with* Rank Media Complaint, ECF No. 3 ¶ 9 (identifying the same call dates and display
4  numbers). Moreover, Mr. Horton did not identify the Rank Media Action as a related case,
5  even though the two cases undoubtedly "ar[ose] from a common nucleus of operative
6  fact[.]" N.D. Tex. Loc. R. 3.3.

7      30. Pivot then filed an evidentiary motion challenging personal jurisdiction,
8  further showing that it didn't make the Subject Calls, nor did it hire anyone to do so on its
9  behalf, and that it didn't sell Mr. Horton the subject policy.

10     31. But Mr. Horton continued to assert his absurd positions that "it doesn't matter
11 who made the calls," who they worked for, or whether Pivot was even aware of those calls.
12 Horton Dep. at 56:8-:10, 79:20-:24, 115:3-:14. Accordingly, rather than reviewing the
13 evidentiary motion and deciding whether he could plausibly allege liability against Pivot,
14 Mr. Horton simply amended his complaint on March 2, 2023, making additional knowingly
15 false allegations. What's more, despite having already received more than $15,000 from
16 Rank Media pursuant to an undisclosed agreement where he released claims arising out of
17 the same calls he alleged Pivot was liable for placing, Mr. Horton continued to tell the
18 federal court in the Pivot action that "Defendant [Pivot] made the calls." Amended Pivot
19 Complaint, ECF No. 13 ¶ 8. Then, in a transparent effort to defer the court from reaching
20 the merits of Pivot's evidentiary jurisdictional motion and thus increase Pivot's litigation
21 expenses, Mr. Horton equivocally alleged that "[a]t this point, there is no way to know who
22 made the calls. But the fact that the Defendant has directly billed the Plaintiff would point
23 to them making the calls." *Id.* ¶ 13.

24     32. During his deposition, Mr. Horton testified that he knew Pivot didn't make
25 the calls itself, but he claimed "it doesn't matter who actually called me" or whether Pivot
26 was even aware of the calls. Horton Dep. at 56:8-:10, 115:3-:14.

33. Mr. Horton asserted baseless TCPA claims against Pivot because those claims supported federal question jurisdiction and Mr. Horton wanted to prosecute the Underlying Action in federal court (the amount at issue for Mr. Horton's refund claim did not exceed $75,000, so he couldn't maintain a diversity action). Mr. Horton testified that he doesn't litigate in state court because the "judges are clowns" and "idiots." Horton Dep. at 42:15-43:10.

34. Due in part to Mr. Horton's knowingly false allegations, the Court in the Underlying Action transferred the Underlying Action to Arizona instead of dismissing it.

35. Having no choice but to defend against his claims on the merits, Pivot served discovery on Mr. Horton and arranged to take his deposition.

36. In response, Mr. Horton produced documents that he claimed supported his claims. His production included an email that Mr. Horton purportedly sent to memberservices@pivothealth.com, captioned "October 13, 2022 at 10:29 AM CST[.]" Refund Demand, attached as Exhibit 4.

37. Pivot's IT department reviewed its inbound email log and confirmed it the Refund Demand Email never touched its servers, meaning it was never sent as Mr. Horton alleged. That is when Pivot discovered that the Refund Demand's caption appeared altered, stating "CST" despite being sent during Daylight Standard Time.

38. During his deposition, Mr. Horton testified that the email was authentic and that Yahoo.com, his email service provider, would confirm the same. Horton Dep. at 106:23-107:15. Mr. Horton further advised that he relied on the Refund Demand email in paragraph 25 of the Complaint. *Id.*

39. Mr. Horton forged the Refund Demand email and lied during his deposition to conceal the fact that he prepared and disclosed false evidence.

40. After Mr. Horton's deposition, Pivot told him that it intended to subpoena Yahoo.com for a copy of Mr. Horton's email log in order to authenticate the Refund Demand email. In response, Mr. Horton immediately retorted that he intended to dismiss the Complaint.

41. On April 23, 2024, Mr. Horton filed a motion to dismiss his Complaint with prejudice. In response, Pivot stated that it did not oppose "the request so long as the dismissal is with prejudice, with Defendant reserving all rights." Underlying Action, ECF No. 66. The Court then dismissed the Underlying Action with prejudice.

42. Mr. Horton dismissed his complaint with prejudice to conceal the fact that he forged the Refund Demand email. Pivot would have raised the forgery to the Court, which would end Mr. Horton's career as a serial litigant.

43. Pivot now brings this action to recover the substantial expenses it incurred due to Mr. Horton's wrongful institution and continuation of the Underlying Action and abuse of discovery process therein, and Pivot also seeks equitable relief to prevent Mr. Horton from further victimizing other innocent parties. No longer should Horton be permitted to use frivolous litigation as a tool to extort defense costs, receiving favorable "pro se" treatment from courts along the way.

## COUNT I

### *Wrongful Institution and Continuation of Civil Proceedings*

44. Pivot incorporates by reference the foregoing paragraphs as though set forth in full herein.

45. A defendant is liable for wrongful institution of civil proceedings where he (1) instituted a civil action (2) without probable cause (3) that was motivated by malice, (4) terminated in the plaintiff's favor, and (5) damaged the plaintiff. *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 758 P.2d 1313, 1318-19 (Ariz. 1988).

46. Mr. Horton wrongfully and maliciously initiated the underlying lawsuit in Texas, and continued litigating those claims in Arizona, alleging violations of the TCPA and Texas law that he knew lacked any foundation in law or fact. *Horton v. PivotHealth*, Case No. 22-cv-02915 (N.D. Tex.) (reassigned to Case No. 2:23-cv-02533 (D. Ariz.)). What's more, Mr. Horton continued to pursue his frivolous claims despite entering into an agreement releasing liability arising out of "all solicitations listed by Plaintiff in the Lawsuit [the Rank Media Action][.]"

47. Prior to initiating the Underlying Action, Mr. Horton knew that Rank Media placed the Subject Calls on behalf of American Health Plans and that AHP sold him the Subject Policy.

48. At the time he initiated his lawsuit, Mr. Horton had no reasonable grounds to believe, and actually did not believe, that the Underlying Action was legally tenable.

49. Mr. Horton instituted the Underlying Action with malice, and not merely to assert his legal rights. Malice may be inferred from the lack of probable cause or other appropriate evidence. Malice can also be found where a suit is initiated as a "nuisance action" to force a settlement upon an unwilling opponent. In the Underlying Action, Mr. Horton stated that "already requested a refund via email that went ignored," referencing evidence that he forged.

50. Additionally, even after he received a settlement payment from Rank Media and learned that it was working for AHP, Mr. Horton continued to falsely allege that Pivot placed the calls. And Mr. Horton continued to pursue his groundless claims after entering into an agreement releasing liability arising out of "all solicitations listed by Plaintiff in the Lawsuit [the Rank Media Action][.]"

51. The Underlying Action was terminated in favor of Pivot because the Court dismissed it with prejudice. The dismissal was not the result of a settlement agreement, and Pivot expressly stated that it was "reserving all rights."

52. As a direct and proximate result of Mr. Horton's wrongful conduct in initiating the Underlying Action, Pivot has suffered damages, including but not limited to the employee time, costs, and legal fees associated with responding to Mr. Horton's allegations and defending against his frivolous and fraudulent claims.

53. Mr. Horton's conduct in initiating and litigating the Underlying Action was willful, malicious, and solely intended to force Pivot to pay an unwarranted settlement, as shown by the forged evidence Mr. Horton prepared to support his claims. Pivot is therefore entitled to punitive damages, along with equitable relief, including an order from this Court

forbidding Mr. Horton from initiating additional litigation pro se without first obtaining the Court's approval.

### COUNT II

*Abuse of Process*

54. Pivot incorporates by reference the foregoing paragraphs as though set forth in full herein.

55. A defendant is liable for abuse of process where he willfully uses a judicially sanctioned process in a wrongful manner for an improper purpose and the wrongful use of that process caused the plaintiff injury. *Nienstedt v. Wetzel*, 651 P.2d 876, 881 (Ariz. Ct. App. 1982).

56. In the instant case, after initiating the Underlying Action, Mr. Horton then responded to Pivot's discovery requests by preparing false evidence, specifically an email purporting to show that he asked Pivot to issue a refund for the subject policy on October 13, 2022.

57. Mr. Horton prepared and then disclosed the forged Refund Demand to support his meritless claim, ultimately hoping to extort payment from Pivot.

58. Mr. Horton's falsifying and then disclosing the forged Refund Demand injured Pivot, including the lost employee time investigating its records to confirm that it never received the Refund Demand and other investigatory efforts.

59. Mr. Horton's conduct in forging and then disclosing the forged Refund Demand was willful, malicious, and solely intended to force Pivot to pay an unwarranted settlement. Pivot is therefore entitled to punitive damages, along with equitable relief, including an order from this Court forbidding Mr. Horton from initiating additional litigation pro se without first obtaining the Court's approval.

WHEREFORE, Pivot prays for the following relief:

(a) That Pivot be awarded any actual damages it sustained as a result of Mr. Horton's actions;

|   |   |   |
|---|---|---|
| 1 | (b) | That Pivot be awarded punitive damages in an amount appropriate to address Mr. Horton's willful, malicious, and intentional conduct in initiating and maintaining a baseless legal action against Pivot and then falsifying and disclosing evidence to support those meritless claims, and to deter similar conduct in the future; |
| 6 | (c) | That Pivot be awarded its expenses of litigation, including reasonable attorneys' fees and costs, incurred in the Underlying Action; |
| 8 | (d) | That Pivot be awarded its expenses of bringing this lawsuit; |
| 9 | (e) | That the Court enter equitable relief forbidding Mr. Horton from initiating additional litigation in a United States District Court pro se without first obtaining this Court's approval; and |
| 12 | (f) | That this Court award such other and further relief as it deems just and appropriate under the circumstances. |

DATED: July 19, 2024

**WATSTEIN TEREPKA LLP**

*/s/ Ryan D. Watstein*
Ryan D. Watstein (*admission forthcoming*)
ryan@wtlaw.com
Patrick J. Fitzgerald (*admission forthcoming*)
pfitzgerald@wtlaw.com
1055 Howell Mill Road, 8th Floor
Atlanta, Georgia 30318
Tel. (404) 782-0695

*Attorneys for Plaintiff*
*PivotHealth Holdings, LLC*