Ryan D. Watstein (*admitted pro hac vice*)
Georgia Bar No. 266019
Patrick J. Fitzgerald (*admitted pro hac vice*)
Georgia Bar No. 405638
**WATSTEIN TEREPKA LLP**
75 14th Street NE, Ste. 2600
Atlanta, Georgia 30309
Telephone: 404-782-0695
ryan@wtlaw.com
pfitzgerald@wtlaw.com

*Counsel for Plaintiff PivotHealth
Holdings, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| PivotHealth Holdings, LLC, | |
| Plaintiff, | |
| v. | Civil Action 2:24-cv-01786-MTL |
| Lucas Horton, | |
| Defendant. | |

## PIVOT'S MOTION FOR SUMMARY JUDGMENT AND CONTEMPT
### ORAL ARGUMENT REQUESTED

# <u>Table of Contents</u>

I.      INTRODUCTION .................................................................................................1

II.     BACKGROUND ..................................................................................................3

    A.      Multiple Independent Entities Tell Horton the Same Story: Pivot had
        Nothing to Do with the Calls. .........................................................................3

    B.      Horton Settles All Liability for the Calls and Tries to Conceal That. ...........4

    C.      Horton Wrongly Initiates the Frivolous Underlying Action. .........................6

    D.      Horton Forges Evidence and Tries to Conceal it by Dismissing the
        Underlying Action. ..........................................................................................7

    E.      Horton Repeatedly Lies to this Court and Violates its Orders. .....................8

III.    STANDARD .........................................................................................................9

IV.     ARGUMENT......................................................................................................10

    A.      Horton Maliciously Initiated and Pursued the Underlying Action. .............10

    B.      Horton Abused Process by Falsifying Evidence. ........................................15

    C.      The Court Should Hold Horton in Contempt for His Outrageous Conduct,
        Including During his Deposition, After the Court Ordered him to be Civil.
        .......................................................................................................................18

V.      CONCLUSION ..................................................................................................19

## <u>Table of Authority</u>

**Cases**

*Bradshaw v. State Farm Mut. Auto. Ins. Co.*,
  758 P.2d 1313 (Ariz. 1988)................................................................11, 12, 15, 16

*C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*,
  213 F.3d 474 (9th Cir.2000).......................................................................10

*Cain v. Fid. Nat. Title Ins. Co.*,
  2013 WL 988106 (Ariz. Ct. App. Mar. 12, 2013)...........................................11, 12, 15

*Chalpin v. Snyder*,
  207 P.3d 666 (Ariz. Ct. App. 2008) ...............................................................12

*Coffey v. Fort Wayne Pools, Inc.*,
  24 F. Supp. 2d 671 (N.D. Tex. 1998) .............................................................14

*Coker Equip. Co. v. Wittig*,
  366 F. App'x 729 (9th Cir. 2010)..................................................................19

*Frey v. Stoneman*,
  722 P.2d 274 (Ariz. 1986)..........................................................................16

*FTC v. Affordable Media, LLC*,
  179 F.3d 1228 (9th Cir. 1999).....................................................................21

*Golan v. FreeEats.com, Inc.*,
  930 F.3d 950 (8th Cir. 2019).......................................................................13

*Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*,
  774 F.3d 935 (9th Cir. 2014).....................................................................20, 21

*Lab./Cmty. Strategy Ctr. v. Los Angeles Cnty. Metro. Transp. Auth.*,
  564 F.3d 1115 (9th Cir. 2009) .....................................................................20

*Lane v. Terry H. Pillinger, P.C.*,
  939 P.2d 430 (Ariz. Ct. App. 1997) ...............................................................16

*Leon v. Caterpillar Indus., Inc.*,
  69 F.3d 1326 (7th Cir. 1995).......................................................................14

*Lucas Horton v. SunPath, Ltd.*,
  2021 WL 982344 (N.D. Tex. Feb. 16, 2021) .................................................14, 15

*Matter of 3 Star Props., L.L.C.*,
  6 F.4th 595 (5th Cir. 2021).........................................................................13

*Miller v. Glenn Miller Prods., Inc.*,
  454 F.3d 975 (9th Cir. 2006).......................................................................10

*Nienstedt v. Wetzel*,
  651 P.2d 876 (Ariz. Ct. App. 1982) ...............................................................17

*Primus Auto. Fin. Servs. v. Batarse*,
  115 F.3d 644 (9th Cir. 1997) ...................................................................11

*Secrease v. W. & S. Life Ins. Co.*,
  800 F.3d 397 (7th Cir. 2015) ..................................................................17

*Stone v. City & Cnty. of San Francisco*,
  968 F.2d 850 (9th Cir.1992) ..............................................................11, 21

*Transgo, Inc. v. Ajac Transmission Parts Corp.*,
  768 F.2d 1001 (9th Cir. 1985) ................................................................21

**Statutes**

47 U.S.C. § 227 .......................................................................................13

Tex. Bus. Com. § 301.052 ..............................................................2, 13, 16

**Other Authorities**

Restatement (Second) of Torts § 676, comment c ....................................14, 15

## I.    INTRODUCTION

Lucas Horton has repeatedly demonstrated his disregard for the integrity of the United States Courts. He initiated and pursued a frivolous lawsuit against Pivot over already-satisfied claims, lied in filings, forged and spoliated evidence, and threatened Pivot counsel verbally and physically—even after this Court ordered him to stop. Pivot invested substantial resources to expose his actions. Now, through this Motion, it asks the Court to hold Horton accountable for his deliberate, criminal abuse of process and malicious prosecution. That begins by entering judgment on Pivot's claims, holding Horton in contempt, and referring this case to the U.S. Attorney's Office to investigate Horton's fraud on the Court.

This saga began three years ago, when Horton instituted and pursued a baseless lawsuit against Pivot for claims that were already paid, and then falsified evidence to support those claims. *Horton v. PivotHealth*, Case No. 22-cv-02915 (N.D. Tex.) (reassigned to D. Ariz. as Case No. 2:23-cv-02533) (the "Underlying Action"). His claims were premised on a series of phone calls by Rank Media and his purchase of a Pivot-branded insurance policy from American Health Plans ("AHP"), an insurance broker. He accused Pivot of violating the Telephone Consumer Protection Act ("TCPA") and other telemarketing laws by placing the calls and failing to provide a refund for the policy.

But these allegations were false and precluded by a prior settlement, and Horton knew that from the start. Not only did AHP tell Horton that it sold him the policy and hired Rank Media to place the calls, but he *actually sued* Rank Media and recovered $18,000. *Horton v. Rank Media USA LLC*, 3:22-cv-02476 (N.D. Tex. Nov. 4, 2022) (the "Rank Media Action"). As part of his settlement, he resolved *all* claims about the calls, including any potential claims against Pivot. But Horton wanted more, so he lied about the settlement—telling Pivot it "fell through"—and deleted all his email correspondence with Rank Media and AHP. Describing his spoliation, he bragged that he "can wipe [his] butt with that -- those pieces of paper if [he] want[s] to." His malice and contempt for the judicial process couldn't be clearer.

Pivot refused to kowtow to Horton's extortion after he filed the Underlying Action, so he got desperate and engaged in increasingly egregious misconduct. To avoid immediate dismissal, he filed an amended complaint, alleging Pivot *itself* "made the calls." He knew that was a lie—Rank Media already paid him $18,000 for the calls *it* admittedly made. But Horton didn't care; he would do anything to extract more money. Thus, when Pivot still refused to pay, he went even further by altogether forging a timely refund demand to Pivot, which was a prerequisite to his Tex. Bus. Com. § 301.052 claim (the "2022 Refund Demand"). Horton only abandoned the Underlying Action after Pivot threatened to subpoena Yahoo for his email logs, which he knew would expose the 2022 Refund Demand as a forgery, threatening his career as a professional litigant. That's why he later deleted all records related to the 2022 Refund Demand.

Even after Pivot sued Horton for his malicious prosecution and abuse of process, he continues to flout his obligations to this Court. He again lied in filings, claiming the 2022 Refund Demand is authentic and Yahoo has records of the same (knowing he had already deleted the emails). He invented fanciful explanations to try and explain Pivot's compelling proof of forgery, all of which have been entirely debunked as explained below. Each new lie forced Pivot to expend additional time and money exposing his cover-up.[1]

Finally, and most recently, Horton violated this Court's August 22 Order to behave "civilly" through a series of verbal attacks and violent outbursts during his deposition. ECF No. 49. He was so combative that the neutral location's staff threatened to expel him and end the deposition. The attached highlight video is a small sample, but it encapsulates his malice and complete disregard for the judicial process.

Lucas Horton is a serial TCPA litigator. By his own estimate, he filed "over 60" TCPA lawsuits, recovering at least $250,000, and presumably engaging in similar

---

[1] On top of all the substantive evidence, Horton failed to answer Pivot's Complaint and defaulted on its requests for admission. Pivot chose to prove the merits of its claims, rather than simply resting on Horton's default. Still, Horton never moved the Court to set aside that default, despite Pivot raising the issue in the parties' August 8, 2025 Case Management Report. ECF No. 43, 6 n.3.

misconduct in the process. He is more experienced than many law firm associates and knows exactly what this Court demands of him. He just doesn't care. He will do whatever he wants to get paid. His actions during the Underlying Action and continuing in this case, especially during his deposition, are antithetical to the integrity of the U.S. Courts. Pivot has, at great expense, brought this conduct to light. The Court must ensure he cannot continue his criminal litigation enterprise. It should grant this motion in its entirety and refer this matter to the U.S. Attorney for this District.

## II.    BACKGROUND

### A.  Multiple Independent Entities Tell Horton the Same Story: Pivot had Nothing to Do with the Calls.

Horton received 14 calls on his cell phone between September 6 and October 10, 2022 (the "Calls"). Statement of Material Facts, attached as Exhibit 1, ("SOMF") ¶ 1. None of the callers mentioned Pivot. *Id.* ¶ 2. On October 10, 2022, he purchased a Pivot-branded policy from AHP, an independent insurance broker. *Id.* ¶ 3. His purchase led Pivot to send him a welcome email, describing his insurance plan. *Id.* ¶ 4.

Days later, Horton sent a pre-suit demand to AHP and Pivot. *Id.* ¶ 5. His demand to Pivot included a proposed complaint, alleging telemarketing liability for the Calls. *Id.* ¶ 6. He assumed that because he purchased a Pivot-branded policy, Pivot must have been responsible for the Calls. *Id.* ¶ 7. But he quickly learned otherwise. *Id.*

First, on October 13, 2022, AHP counsel told Horton:

> On October 10, 2022 a live transfer lead came in to AHP ***from Rank Media***, with you (Lucas Horton) in Richardson, TX on the line. The live transferred call was answered by ***our agent Katie Kreucher***. . . .
> The call AHP received with you on the line was from a ***third-party provider called Rank Media, who sends leads to AHP from parties who are interested in obtaining health insurance***.

*Id.* ¶ 8.

Pivot then contacted Horton on October 17, 2022. *Id.* ¶ 9. He responded by acknowledging "***I have figured out who actually called me, which is who I really want to***

**sue. They are called RankMedia**." *Id.* Pivot then confirmed it did not call Horton, and it wasn't connected with Rank Media. *Id.*

But Horton didn't care; he assumed Pivot would pay to avoid the expense of a lawsuit, as many prior targets did. *Id.* ¶ 10. Accordingly, he continued to insist that Pivot was "on the hook[.]" *Id.* ¶ 11. Pivot patiently explained there was no liability:

> **There is no connection between Pivot and Rank and you** during the time period in which you may have been contacted. Pivot did not consent, authorize, or ratify any calls you allege in the complaint. Pivot never requested Rank Media to make calls to you on its behalf. **Pivot never had your phone number or contact information in which to provide such information to any person or entity.** We are informed that the policy you claim you purchased was done so **through an insurance broker (AHP). AHP did not obtain any information of any kind about you from Pivot.**

*Id.* ¶ 12 (bold italic emphasis added).

In the meantime, Horton initiated the Rank Media Action on November 4, 2022. *Id.* ¶ 14. There, he alleged Rank Media was directly and vicariously responsible for the Calls. *Id.* (identifying the same calls on the same dates).

Michael Maxvill represented Rank Media in the Rank Media Action.[2] *Id.* ¶ 15. At no time during their negotiations did Rank Media deny making the calls, nor did it claim Pivot was involved. *Id.* ¶ 16. On the contrary, when Horton mentioned his claims against Pivot, Mr. Maxvill had to ask, "**what is Pivot Health's relationship to the Rank Media case?**" *Id.* ¶ 17 (emphasis added).

**B. Horton Settles All Liability for the Calls and Tries to Conceal That.**

When Horton settled his claims against Rank Media for $18,000, he agreed it would satisfy *all* liability for the Calls. *Id.* ¶ 20. On December 16, 2022, after Horton mentioned his claims against Pivot, Mr. Maxvill responded:

Lucas -

---

[2] Rank Media assumed AHP's defense.

> Your email is not 100% clear. Are you telling me you do not want to include a release against Pivot in your settlement with Rank Media? ***If so, that is a deal breaker***. For $18,000, Rank Media cannot risk being brought into a lawsuit by Pivot if you sue Pivot for similar violations. All of your claims against ***<u>any party</u>*** related to phone calls in your complaint must be released.

*Id.* ¶ 21 (bold italic emphasis added, underline original). When Horton initially refused to release his claims against Pivot, Mr. Maxvill proposed:

> Lucas -
>
> You can sue Pivot in a separate lawsuit if you want a refund. We can agree in the settlement agreement your release of Rank Media and other parties surrounding the phone calls does not include a release against Pivot ***for your refund***.
> Rank Media's payment of $18K must end this suit ***and not leave the possibility of Rank  Media being dragged into another lawsuit over the same calls***.  Rank Media does not share your opinion this case is worth $112K.  Rank Media will proceed with its defense.

*Id.* ¶ 22 (emphasis added). Horton wanted the $18,000 and later admitted he would "say whatever [he] want[ed] to the guy just to get [Mr. Maxvill] to shut up[.]" *Id.* ¶ 23. Accordingly, he agreed to settle his telemarketing claims against Pivot:

> Go ahead and send the agreement for 18K.
>
> I found another law pivot broke by not giving me a refund that is 10K a pop.  I will get them that way[.]

*Id.* ¶ 24.

Horton executed a release on December 30, 2022. *Id.* ¶ 25. Consistent with their email correspondence, the Rank Media Release satisfied all telemarketing claims "against <u>any</u> party" related to the Calls:

> Plaintiff hereby RELEASES . . . Defendant. . . **and any other party whatsoever** ("Released Parties") from any and all claims . . . arising out of . . . the Lawsuit. . . . **This Release includes all solicitations listed by Plaintiff in the Lawsuit and all other solicitations made to Plaintiff by Defendant and/or the Released Parties through the date of this Agreement.**

*Id.* ¶ 26 (bold emphasis added).

Horton knew the Rank Media Release resolved his telemarketing claims against Pivot. He told Pivot that on December 20, 2022:

> I will be settling with Rankmedia, who actually made the calls
> and will be absolving them <u>and anyone else</u> **for the TCPA and**
> **TX 305 violations. They made sure that included pivot**[.]

*Id.* ¶ 27 (emphasis added).

But Horton wanted more money, so on December 28, 2022, he lied to Pivot that the "agreement with rankmedia fell through[.]" *Id.* ¶ 29. He also deleted his email exchanges with AHP and Rank Media while the Underlying Action was pending. *Id.* ¶ 30. Pivot only learned about the settlement after the Court denied its motion to dismiss, when it began investigating the merits and contacted Rank Media counsel. *Id.* ¶ 32. Horton is completely unapologetic about this spoliation. He bragged, "I can wipe my butt with that -- those pieces of paper [correspondence with Rank Media] if I want to." *Id.* ¶ 31.

### C. Horton Wrongly Initiates the Frivolous Underlying Action.

By December 29, 2022, Horton knew that: (1) Rank Media made the Calls on behalf of AHP, and neither company worked for Pivot; (2) AHP sold him the Pivot-branded policy; (3) he promised to settle all of his telemarketing claims "against <u>any</u> party" for $18,000; and (4) he failed to make a timely refund demand for the Pivot-branded policy. *Id.* ¶ 33.

But Horton didn't care about the facts. Accordingly, when Pivot refused to pay after he lied about the Rank Media settlement falling through, he initiated the Underlying Action, asserting the exact claims Rank Media already satisfied. *Id.* ¶¶ 33–34.

To obtain an early dismissal, Pivot filed an evidentiary motion, establishing that it had nothing to do with the Calls, didn't hire Rank Media or AHP, and didn't even engage in outbound telemarketing at the time. *Id.* ¶ 35. But Horton wanted the Underlying Action to continue, hoping the added expense would convince Pivot to pay him more than he had already got. *Id.* ¶ 36. So he filed an amended complaint, doubling down on satisfied claims and falsely stating that Pivot *itself* made the Calls. *Id.* He admitted at deposition that he knew those allegations were false: "***I know that someone at Pivot didn't pick up the phone***

1    *and dial my number." Id.* ¶ 37. When Pivot's counsel pressed him on why he would make

2    those allegations, he responded, "[i]t doesn't matter what I said," "who cares?" *Id.*

3    But Horton is wrong. It did "matter what [he] said." On November 16, 2023, the

4    magistrate judge recommended that the Court deny Pivot's motion to dismiss, opining that

5    Horton may be entitled to discovery to identify "'who made the calls[.]'" *Id.* ¶ 38 (quoting

6    the Amended Complaint). The Court then transferred the case to this Court. *Id.* ¶ 39.

7    **D. Horton Forges Evidence and Tries to Conceal It by Dismissing the
     Underlying Action.**

8

9    Based on the report and recommendation, Pivot had no choice but to defend the

10   merits rather than filing another motion to dismiss. Horton, for his part, grew increasingly

11   frustrated that Pivot still wouldn't pay. He knew the facts would ultimately vindicate Pivot,

12   so he falsified evidence.

13   Pivot served its first set of discovery to Horton on February 13, 2024, at 9:15 AM

14   ET. *Id.* ¶ 40. Pivot asked for, among other things, evidence supporting his allegation that

15   he "requested a refund the day after purchasing the policy." *Id.*

16   That same day, February 13, at 11:29 AM ET—*after* Pivot served its discovery—

17   Horton (from lukeduke365@yahoo.com) emailed memberservices@pivothealth.com,

18   writing "Please refund this" (the "February 2024 Refund Demand"). *Id.* ¶¶ 41–42. This

19   was more than a year into the Underlying Action, raising the question: Why now?

20   On March 18, 2024, Horton served his discovery responses, including the forged

21   2022 Refund Demand. *Id.* ¶ 46. Using the Ferbuary 2024 Refund Demand, Horton created

22   a PDF file purporting to show an email from lukeduke365@yahoo.com to

23   memberservices@pivothealth.com on **October 13, 2022,** at 10:29 AM CST, the exact same

24   time Pivot received the 2024 Refund Demand years later.[3] *Id.* ¶ 42. And it wasn't only sent

25   at the same time; it contained the same opening text: "***Please refund this***." *Id.* ¶¶ 42–44.

26   _____

27   [3] Accounting for the one-hour time difference between Horton's Central Time email
     account and Pivot's administrative console, which stamped the 2024 Refund Demand in
     Eastern Time, the forged 2022 Refund Demand was allegedly transmitted at the exact same
     time Pivot received the 2024 Refund Demand, 10:29AM CT. *Id.* ¶ 43.

28

Even more damning, according to the unaltered metadata, the Refund Demand PDF file was created on February 13, 2024, at 11:36 AM, **right after Horton sent and Pivot received the February 2024 Refund Demand**. *Id.* ¶ 45.

But Horton failed to account for the change in time, so the 2022 Refund Demand was captioned "October 13, 2022 at 10:29 AM *CST*[,]" despite purportedly being sent during Daylight Savings Time (CDT). *Id.* ¶ 49.

The 2022 Refund Demand was a forgery, and so it's unsurprising that Pivot never received it. *Id.* ¶ 47. Horton also, of course, didn't produce it when Pivot told him he had no refund claim because it had no record of his refund request. *Id.* ¶¶ 47–48.

Despite being caught red-handed, Horton perjured himself in the Underlying Action, testifying that the Refund Demand was authentic. *Id.* ¶ 50. But after his deposition, Pivot told him that it was going to subpoena Yahoo, seeking "the date and time of inbound and outbound email communications" for the lukeduke365@yahoo.com account. *Id.* ¶ 51. That spooked Horton, as he knew that there was no record of the 2022 Refund Demand and that the forgery was a criminal act that could jeopardize his booming business as a pro se litigant who netted at least $250,000 from suing companies. ECF No. 32–1, 22:7–8.

Accordingly, about an hour later, and in direct response to Pivot's statement of its intent to subpoena Yahoo, he completely capitulated: "I am considering dropping this [case]." SOMF ¶ 52. He then did just that, filing a motion to dismiss his own claims with prejudice. *Id.* ¶ 53. Pivot responded that it did "not oppose the request so long as the dismissal is with prejudice, with Defendant reserving all rights." *Id.* ¶ 54. On April 26, 2024, the Court dismissed the Underlying Action with prejudice. *Id.* ¶ 55.

By this time, Pivot had incurred more than $147,500 defending the Underlying Action. *Id.* ¶ 56. Pivot then initiated this action, asserting claims for malicious prosecution and abuse of process.

**E.  Horton Repeatedly Lies to this Court and Violates its Orders.**

Having learned nothing in the Underlying Action, Horton continues to flout his obligations to this Court. For starters, even after Pivot counsel warned him about his

8

obligation to preserve evidence, Horton admits he deleted all evidence related to the 2022 Refund Demand. *Id.* ¶ 58.

Horton also lied to the Court about the 2022 Refund Demand. *Id.* ¶ 59. He claimed the 2022 Refund Demand was authentic and that Yahoo has evidence that would prove as much. But he knew it was a forgery, and that he had already deleted any email records related to the file. *Id.*

Each time Horton lied about the Refund Demand, Pivot had to spend more time and money rebutting his groundless stories. *Id.* ¶ 60. For example, he told the Court that the timestamp on the Refund Demand read "CST" because he uses a SurfShark VPN, causing the timestamp to register that he was in a country that doesn't recognize daylight savings. *Id.* ¶ 61. But Yahoo testified that the timestamp is based on the user's settings, and Horton's lukeduke365@yahoo.com subscriber data lists City and State as Dallas, Texas. *Id.* Moreover, Pivot counsel purchased a SurfShark VPN, created a Yahoo email, and confirmed that the VPN had no impact on the timestamp. *Id.*

Finally, Horton has repeatedly attacked Pivot's counsel, even after this Court ordered him to stop. The Court warned him his behavior was "unacceptable" and ordered the parties to "treat each other civilly in their interactions during this litigation[.]" *Id.* ¶ 62. But Horton believes his assets cannot be reached, so he thinks the Court has no power. *Id.* ("I'm from Texas so default me all you want."). And during his deposition, he violated the August 22 Order through a series of verbal attacks and violent outbursts. *Id.* ¶ 63; *see also* Highlight Video, attached as Exhibit 2. In two-and-a-half hours, he called Pivot counsel a "fucking clown," "fucking idiot," "God, you're an idiot," "God, you're a douche bag," "You're a clown man," and "God, you're a clown." SOMF ¶ 63. He made crude sexual remarks, like: "Was I your -- was I your virgin sanction?[,]" referring to his denied motion for sanctions. *Id.* And he was physically combative, slamming the table and throwing exhibits. *Id.* ¶¶ 63–65; Highlight Video. He was so out of control that the neutral location's staff threatened to kick him out and end the deposition. SOMF ¶ 65.

## III.    STANDARD

"When the party moving for summary judgment would bear the burden of proof at trial, it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. In such a case, the moving party has the initial burden of establishing the absence of a genuine issue of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co., Inc. v. Darden Rests., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (cleaned up). When the moving party meets that burden, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 987 (9th Cir. 2006) (quoting Fed. R. Civ. P. 56(e)). Here, the uncontested evidence proves that Horton maliciously instituted and pursued a frivolous lawsuit against Pivot, and then abused process by falsifying evidence.

To hold a party in contempt:

> The moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply.

*Stone v. City & Cnty. of San Francisco*, 968 F.2d 850, 856 n. 9 (9th Cir. 1992) (citation omitted). The contempt power is designed to "protect the due and orderly administration of justice and maintain the authority and dignity of the court." *Primus Auto. Fin. Servs, Inc.. v. Batarse*, 115 F.3d 644, 648 (9th Cir. 1997) (cleaned up). The attached video is definitive evidence that Horton violated the August 22 Order and should be held in contempt.

## IV.    ARGUMENT

### A. Horton Maliciously Initiated and Pursued the Underlying Action.

To support a wrongful institution (or continuation) of civil process claim ("WICP"), the plaintiff must prove the defendant "(1) instituted a civil action which was (2) motivated by malice, (3) begun without probable cause, (4) terminated in plaintiff's favor and (5) damaged plaintiff." *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 758 P.2d 1313, 1319 (Ariz.

1988). The claim "encompasses 'continuing' or 'procuring' civil proceedings." *Cain v. Fid. Nat. Title Ins. Co.*, 2013 WL 988106, at *4 (Ariz. Ct. App. Mar. 12, 2013). Thus, it is not only what the defendant knew when he ***initiated*** suit, but also whether "a reasonably prudent man" would have "continued[.]" *Id.* (internal quotation omitted).

**Civil Action.** Here, the Court's own docket proves the first element. Horton initiated a federal lawsuit against Pivot on December 29, 2022. SOMF ¶¶ 33–34. He then filed an Amended Complaint, alleging that Pivot itself placed the Calls and failed to process a refund he made a day after buying the policy. *Id.* ¶ 36. He continued pursuing those claims for over a year. *Id.* ¶ 55.

**Probable Cause.** Horton never had probable cause, but he continued to assert knowingly false and satisfied claims, hoping Pivot would pay to avoid defense costs. Probable cause has a "subjective *and* objective" component. *Bradshaw*, 758 P.2d at 1319. "[A] defendant's conduct is evaluated not only against an objective standard of reasonableness, but also against his or her subjective state of mind at the time of the alleged wrongdoing." *Cain*, 2013 WL 988106, at *7; *Bradshaw*, 758 P.2d at 1319 ("The initiator of the action must honestly *believe* in its possible merits; and, in light of the facts, that *belief must be objectively reasonable.*").

Courts first analyze the objective component. *Chalpin v. Snyder*, 207 P.3d 666, 672 (Ariz. Ct. App. 2008). If a defendant's belief is objectively unreasonable, his subjective intent is irrelevant. *Bradshaw*, 758 P.2d at 1322. The Court considers whether the litigant (1) had a good chance of establishing his case, (2) advanced a reasonable argument to modify existing law; and (3) conducted a reasonable pre-filing investigation. *Chaplin*, 207 P.3d at 674. Horton fails each of these measures.

Horton could not reasonably believe he had any chance—let alone a "*good chance*"—of proving his claims against Pivot. He knew that he didn't ask for a refund

within seven days of buying the policy—fatal to his Tex. Bus. Com. § 301.052 claim.[4] SOMF ¶¶ 40–49. His telemarketing claims were similarly frivolous. AHP explicitly admitted it sold him the policy and hired Rank Media to make the Calls. *Id.* ¶ 8. Rank Media agreed to pay him $18,000 for those calls days before he filed suit. *Id.* ¶¶ 20–26. Pivot, for its part, told Horton that it had nothing to do with the Calls—it didn't even have his phone number until he bought the policy. *Id.* ¶¶ 9–13. On those facts, no reasonable person could conclude they had any chance to establish liability against Pivot. Yet, Horton pressed ahead—and worse, he amended his complaint (after Rank Media paid him $18,000) to allege that Pivot *itself* placed the calls, which he **knew was a lie**. *Id.* ¶¶ 35–37 ("I knew Pivot didn't … dial my number.").

On top of all this, Horton knew that Rank Media had satisfied Horton's telemarketing claims days after he initiated the Underlying Action. His email exchanges with Mr. Maxvill, along with the plain language of the Release, reflect the parties' intent to resolve those claims in their entirety. *Id.* ¶¶ 20–26. He recovered $18,000—$1,384 per call—nearly the maximum treble statutory damages. 47 U.S.C. § 227(c)(5)(B), (C). Horton tried to conceal that Release from Pivot, lying that the settlement "fell through" and deleting his email exchanges. SOMF ¶¶ 29–30. And even setting the Release aside, Horton knew that he couldn't recover twice for the same claims. *Matter of 3 Star Props., L.L.C.*, 6 F.4th 595, 612 (5th Cir. 2021) ("A party is not entitled to a double recovery").

The claims also lacked any basis in existing law, and there was no reasonable argument to extend that precedent. To start, Horton knew there was no direct liability because Pivot itself didn't initiate the calls. *Golan v. FreeEats.com, Inc.*, 930 F.3d 950, 960 (8th Cir. 2019) (describing the standard for direct liability under the TCPA). The only connection between Pivot and the Calls was that AHP sold Horton a Pivot-branded policy. But it is hornbook law that "a retailer or dealer of goods is not an agent of the

---

[4] This claim was also subject to the same defenses as the telemarketing claims because it only applies to persons who sell "consumer goods or services through the use of a telephone solicitor[.]" Tex. Bus. Com. § 301.052.

manufacturer." *Coffey v. Fort Wayne Pools, Inc.*, 24 F. Supp. 2d 671, 678 (N.D. Tex. 1998); *see also Lucas Horton v. SunPath, Ltd.*, 2021 WL 982344, at *4 (N.D. Tex. Feb. 16, 2021) ("Apart from Defendant being listed as the administrator of the warranty Northcoast sold him, Plaintiff does not allege or point to any evidence showing that Defendant played any role in contacting him by phone."). Accordingly, the mere fact that a caller sells a particular brand "does not render it an agent of [that brand], just as every bar which advertises that they sell a particular brand of beer is not the agent of the brewery whose name they advertise." *Leon v. Caterpillar Indus., Inc.*, 69 F.3d 1326, 1336 (7th Cir. 1995).

Finally, Horton refused to conduct any pre-suit investigation. He scoffed at that obligation, testifying "I have a fucking MBA. I know how stuff like that works." SOMF ¶ 19. He never asked the callers who they worked for, nor did he ask AHP or Rank Media about their relationship with Pivot—despite his extensive negotiations with Mr. Maxvill (after Pivot told him it had nothing to do with the Calls). *Id.* ¶¶ 2, 19. Rank Media itself asked Horton, "what is Pivot Health's relationship to the Rank Media case?[,]" signalling there was no contractual relationship between the two. *Id.* ¶ 17. But Horton never inquired about that because he knew the answer.

The evidence also proves Horton lacked even a subjective belief in his claims. He knew he didn't demand a refund within seven days of buying the policy; that's why he forged the 2022 Refund Demand. SOMF ¶¶ 40–49; *see also infra* Section IV, B. He also knew his direct liability allegations were false, but he continued to pursue those claims for over a year. *Id.* ¶¶ 36–37. Moreover, based on his earlier cases where courts identified his failure to allege that the defendant had "any role in contacting him by phone," he knew that Pivot receiving some undefined benefit from the Calls is insufficient for vicarious liability. *Horton*, 2021 WL 982344, at *4.

**Malice.** The evidence also establishes that Horton was motivated by malice. "The malice element in a civil malicious prosecution action does not require proof of intent to injure." *Bradshaw*, 758 P.2d at 1320. The lack of probable cause, alone, "may give rise to an inference of malice." *Cain*, 2013 WL 988106, at *8. Otherwise, malice exists where the

litigant "primarily used the action for a purpose other than that of securing the proper adjudication of the claim." *Bradshaw*, 758 P.2d at 1320 (citing Restatement (Second) of Torts § 676, comment c). The Restatement outlines various scenarios, including where the "person bringing the civil proceedings is aware that his claim is not meritorious" or wants to force "a settlement that has ***no relation to the merits of the claim.***" Restatement § 676 comment c.

Here, Horton never believed in his claims; he just hoped the added expense would force Pivot to pay. He knew he failed to make a timely refund demand and forged evidence to support his Tex. Bus. Com. § 301.052 claim. SOMF ¶¶ 40–49. And when Pivot filed an evidentiary motion, proving it had nothing to do with the calls, Horton doubled down on his allegations to avoid dismissal. He told the Court Pivot itself made the calls and that he needed discovery to identify the caller, when he knew all along it was Rank Media at AHP's behest. *Id.* ¶¶ 33–37. Such a dubious litigation strategy is "not a legitimate use of civil process"; it's malicious. *Bradshaw*, 758 P.2d at 1320.

Horton likewise did everything in his power to avoid the proper adjudication of his claims. He forged evidence, hoping to convince Pivot that he had a colorable Tex. 301.052 claim. *See infra* Section IV, B. He also spoliated his email communications with AHP and Rank Media while the Underlying Action was pending. SOMF ¶¶ 30–31. Those communications prove that his telemarketing claims were satisfied and released. But Horton said he can "wipe [his] butt with [] those pieces of paper[,]" hoping to deprive Pivot from exploring its defenses. *Id.* Finally, he repeatedly attacked Pivot's counsel, hoping to wear Pivot down and convince it to pay. *Id.* ¶¶ 13, 63; Highlight Video. In short, he never cared about the merits of his claims; he just wanted to make it as expensive as possible. That is quintessential malice.

**Resolution of Underlying Action in Pivot's Favor.** The Underlying Action was resolved in Pivot's favor. "When a termination or dismissal indicates in some fashion that the accused is innocent of wrongdoing, it is a favorable termination." *Lane v. Terry H. Pillinger, P.C.*, 939 P.2d 430, 432 (Ariz. Ct. App. 1997). "The ultimate legal decision with

respect to what constitutes a favorable termination rests with the judge." *Frey v. Stoneman*, 722 P.2d 274, 279 (Ariz. 1986). The court must examine the circumstances that led to the dismissal to determine whether there was any indication "in some fashion that the accused [was] innocent of wrongdoing." *Id.*

Here, the circumstances surrounding the dismissal confirm Pivot's innocence several times over. Horton agreed to dismiss the Underlying Action hours after Pivot told him it planned to subpoena Yahoo, exposing his forgery and jeopardizing his prolific career as a serial extortionist. SOMF ¶¶ 51–52. He acknowledged he couldn't prove his claims. *Id.* And while Horton dismissed his claims with prejudice, Pivot reserved its right to bring this action, even though it didn't need to. *Id.* ¶¶ 53–55.

**Injury.** Finally, Horton injured Pivot by pursuing the Underlying Action. In a WICP claim, the claimant is entitled to the expenses "incurred in defending himself against the proceedings," including "reasonable attorney's fees[.]" Restatement (Second) of Torts § 681. Here, Pivot incurred more than $140,000 defending the Underlying Action. SOMF ¶ 56.

### B. Horton Abused Process by Falsifying Evidence.

Next, the undisputed evidence also proves Pivot's abuse of process claim. The plaintiff must show defendant "(1) used a legal process against the plaintiff; (2) primarily to accomplish a purpose for which the process was not designed; and, (3) harm has been caused to the plaintiff by such misuse of process." *Nienstedt v. Wetzel*, 651 P.2d 876, 881–82 (Ariz. Ct. App. 1982). Falsifying evidence is the quintessential example of abuse of process because it "undermines the most basic foundations of our judicial system." *Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015). Even where unsuccessful, "the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly." *Id.*

**Use of a Legal Process for an Improper Purpose.** The attached evidence proves that Horton falsified the 2022 Refund Demand and disclosed it in response to discovery to support an otherwise meritless claim. SOMF ¶¶ 40–49. He therefore used a legal process

1   for an undeniably improper purpose, satisfying the first and second elements. *Nienstedt*,

2   651 P.2d at 880–81 (holding that discovery is a "process"); Restatement (Second) of Torts

3   § 682 (1977) (explaining that improper purpose includes extorting an unwarranted

4   payment).

5   Starting with Pivot's records, the memberservices@pivothealth.com account never

6   received the alleged October 13, 2022, email, and Horton failed to produce it when Pivot

7   told him in December 2022 that it had no record of a refund request. SOMF ¶ 47. On the

8   other hand, the account did receive an email from lukeduke365@yahoo.com on February

9   13, 2024. *Id.* ¶ 42. Like the purported 2022 email transmission, the 2024 Refund Demand

10  opened "[p]lease refund this" and was received at the **exact same time** Horton purportedly

11  transmitted the 2022 Refund Demand years before, 10:29 AM CT. *Id.* This was years into

12  a lawsuit where Horton sought, among other things, a refund for his insurance policy. There

13  was no innocent reason for him to ask a customer service account for a refund then.

14  The unaltered metadata confirms the fraud Horton perpetrated on this Court. The

15  PDF file was created on February 13, 2024, at 11:36 AM. *Id.* ¶ 45. This is (1) hours after

16  Pivot served its discovery requests, asking Horton to produce evidence supporting his

17  allegation that he "requested a refund the day after purchasing the policy," and (2) an hour

18  after Pivot received the 2024 Refund Demand. *Id.*

19  And Yahoo's records provide additional confirmation. There's no record of the 2022

20  Refund Demand in the lukeduke365@yahoo.com's "sent" folder, as it would be if Horton

21  had actually sent it. *Id.* ¶ 61. And Yahoo itself refuted Horton's false claim that the email

22  was automatically deleted.[5] *Id.*

23  Horton's conduct is further confirmation of his forgery. To start, after years of

24  stubborn litigiousness, ignoring all the evidence that Pivot had nothing to do with the Calls,

25

26

27  _____

[5] And because Horton now admits he deleted all emails related to the 2022 Refund Demand,
he concedes that he lied to the Court about the email being deleted as part of an automatic

28  deletion policy. ECF No. 26, 1.

Horton finally agreed to dismiss the Underlying Action **hours** after Pivot threatened to subpoena Yahoo. *Id.* ¶¶ 51–52. And he deleted all email records related to the 2022 Refund Demand after Pivot counsel warned him about his duty to preserve evidence. *Id.* ¶ 58.

The inescapable conclusion is that Horton failed to make a timely refund demand. He didn't think the case would ever get far enough for that to matter. But when it did, and he needed to support his refund demand with evidence in response to discovery, he emailed memberservices@pivothealth.com. SOMF ¶¶ 41–42. He then used that email to create the Refund Demand, which is why the Refund Demand is captioned "CST"; because Horton altered the February 2024 Refund Demand without accounting for the change between Daylight Savings and Standard Time. *Id.* ¶¶ 43, 49.

Horton offered a host of shifting excuses for the Refund Demand. *Id.* ¶¶ 49, 59 (summarizing and refuting his explanations). He claimed that the Refund Demand is captioned "CST" because he used a SurfShark VPN. *Id.* ¶ 61. This explanation fails for several reasons. First, this could only explain the timestamp disparity, but none of the *other* evidence that the Refund Demand is a forgery, like Pivot and Yahoo's records, and the PDF metadata. Horton has no response to *any* of *that* evidence. Moreover, Yahoo testified that the time stamp is based on the user's settings, and Horton's subscriber data lists his city and state as Dallas, TX. *Id.* ¶ 61. Nevertheless, as a precaution, Pivot counsel purchased a SurfShark VPN and created a Yahoo email account to test whether the VPN would impact Yahoo's timestamp. *Id.* The Yahoo account, pfitzgerald121288@yahoo.com is associated with Texas, where Pivot counsel was staying when he created the account. *Id.* Pivot counsel set his SurfShark VPN to an IP address associated with Lithuania. *Id.* ¶ 61. The email was correctly timestamped "September 24, 2025 at 09:53:00 AM CDT," accurately reflecting Central Daylight Time, where counsel was staying. *Id.*

**Horton Injured Pivot**. Finally, Horton's forgery harmed Pivot, causing it to incur damages in the Underlying Action and continuing in this case. The damages for an abuse of process claim include the expenses incurred responding to the alleged abuse. *Liberti v. City of Scottsdale*, 560 P.3d 322, 329 (Ariz. Ct. App. 2024); *see also Coker Equip. Co. v.*

17

*Wittig*, 366 F. App'x 729, 733 (9th Cir. 2010) ("[A]ttorney fees and costs can constitute compensatory damages for abuse of process.").

Horton injured Pivot by disclosing the 2022 Refund Demand, forcing Pivot to investigate the PDF and confirm that it's a forgery. For starters, Pivot's IT employee spent hours investigating the purported email and trying to identify why it had no record of the alleged refund request. SOMF ¶ 47. It searched the memberservices@pivothealth.com and compared the email to the February 2024 Refund Demand. *Id.* Pivot's counsel likewise spent hours investigating the purported email during the Underlying Action and examining Horton about the same. *Id.* And Pivot continued to incur damages responding to Horton's excuses about the 2022 Refund Demand in this case.[6] *Id.* ¶ 60. Accordingly, the undisputed record proves that Pivot sustained an injury to support its abuse of process claim.

## C. The Court Should Hold Horton in Contempt for His Outrageous Conduct, Including During his Deposition, After the Court Ordered him to be Civil.

Finally, Horton's behavior during his deposition—violating this Court's Order—mandates a separate contempt order. Civil contempt "consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014) (internal quotations omitted). The moving party has the burden to show respondent "[(1)] violated the court order, (2) beyond substantial compliance, (3) not based on a good faith and reasonable interpretation of the order, (4) by clear and convincing evidence." *Lab./Cmty. Strategy Ctr. v. Los Angeles Cnty. Metro. Transp. Auth.*, 564 F.3d 1115, 1123 (9th Cir. 2009). The burden "then shifts to the contemnors to demonstrate why they were unable to comply[.]" *FTC v. Affordable Media, LLC*, 179 F.3d 1228, 1239 (9th Cir. 1999). The alleged contemnor must show that he performed "all reasonable steps within their power to [ensure] compliance with the court's orders[.]" *Stone*, 968 F.2d at 856.

---

[6] The fees Pivot incurred in this case are also recoverable pursuant to Pivot's motion for sanctions. ECF No. 25.

Here, the Court's order was specific and definite. During the hearing, it told Horton that his past attacks on Pivot counsel were "unacceptable" "[r]egardless of the reasons[,]" so Horton knew what the Court meant by "civilly." ECF No. 53, 5:3–20. And the deposition was undeniably an "interaction during this litigation." Horton engaged in the exact same attacks that precipitated the Order, calling Pivot counsel a "fucking clown," "fucking idiot," "God, you're an idiot," "God, you're a douche bag," "You're a clown man," and "God, you're a clown." SOMF ¶¶ 63–65; Highlight Video. He likewise made crude sexual comments, like "was I your virgin sanction?" (even though Pivot was never sanctioned). SOMF ¶ 64. Worst of all, and in attempt to intimidate Pivot counsel, Horton was physically combative. Highlight Video. He threw exhibits, slammed the table, and screamed at Pivot counsel. SOMF ¶ 65. His behavior was so bad that the staff threatened to expel him from the building. *Id.*

Through his deposition, Horton once again demonstrated his contempt for this Court's authority. And because this is part of a longstanding pattern of abuse, the Court must enter an order to "uphold the power of the court[.]" *Sea Shepherd*, 774 F.3d at 945. At the very least, it should order Horton to pay Pivot's attorneys' fees connected with the deposition and preparing this motion. *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1028 (9th Cir. 1985) (affirming award of attorneys' fees for successful contempt motions).

## V.    CONCLUSION

Throughout the Underlying Action and continuing in this case, Horton has shown contempt for Pivot counsel and this Court. He pursued a frivolous lawsuit, spoliating and forging evidence to disguise his claims as meritorious. He will say "whatever [he] wants" to convince companies to pay, believing they have no choice because of the considerable cost of defense. There's no telling how many companies fell victim to his scheme, or the Courts that unwittingly ruled on similar false statements.

But Pivot refused. And, at considerable expense, it successfully defended against Horton's claims and exposed his egregious misconduct, proving that despite his long

history as a serial litigant, Horton has no respect for the U.S. Courts. He simply views it as a tool for extortion. The Court should enter judgment on Pivot's claims in their entirety and refer Horton to the U.S. Attorney. Unless this Court acts forcefully, Horton will continue to weaponize the judiciary, victimize other law-abiding companies, and squander scarce judicial resources—and others will use his example to know they can do the same.

DATED: December 5, 2025

**WATSTEIN TEREPKA LLP**

*/s/ Ryan D. Watstein*
Ryan D. Watstein (*admitted pro hac vice*)
ryan@wtlaw.com
Patrick J. Fitzgerald (*admitted pro hac vice*)
pfitzgerald@wtlaw.com
75 14th Street NE, Ste. 2600
Atlanta, Georgia 30309
Tel. (404) 782-0695

*Attorneys for Plaintiff*
*PivotHealth Holdings, LLC*

1

**<u>CERTIFICATE OF SERVICE</u>**

2

I hereby certify that on December 5, 2025, I caused a true and correct copy of the

3

foregoing to be electronically filed a with the Clerk of the Court by using the CM/ECF

4

system, which will send a notice of electronic filing to all counsel of record and via email

5

and U.S. first class mail, postage prepaid as follows:

6

Lucas Horton
1202 Stratford

7

Richardson, TX 75080
Email: lukeduke365@yahoo.com

8

9

*/s/ Ryan D. Watstein*

10

Ryan D. Watstein

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1