Ryan D. Watstein (*admitted pro hac vice*)
Georgia Bar No. 266019
Patrick J. Fitzgerald (*admitted pro hac vice*)
Georgia Bar No. 405638
**WATSTEIN TEREPKA LLP**
75 14th Street NE, Ste. 2600
Atlanta, Georgia 30309
Telephone: 404-782-0695
ryan@wtlaw.com
pfitzgerald@wtlaw.com

*Counsel for Plaintiff PivotHealth
Holdings, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

PivotHealth Holdings, LLC,

      Plaintiff,

v.

Lucas Horton,

      Defendant.

Civil Action 2:24-cv-01786-MTL

## PIVOT'S RESPONSE TO DEFENDANT'S MOTION
## FOR SUMMARY JUDGMENT

## Table of Contents

I.    INTRODUCTION ........................................................................................1

II.   BACKGROUND ..........................................................................................3

III.  LEGAL STANDARD ...................................................................................6

IV.   ARGUMENT ...............................................................................................7

    A.    The Record Proves Wrongful Prosecution and Abuse of Process. ...............7

        i.     Wrongful Institution of Civil Proceeding. ..........................................7

        ii.    Abuse of Process. .............................................................................11

        iii.   Burden of Proof and Standing. .........................................................13

    B.    Horton's Procedural Defenses Fail. .............................................................14

        i.     Pivot's Claims Were Not Compulsory Counterclaims. ....................14

        ii.    Initial Disclosure. ............................................................................16

V.    CONCLUSION ..........................................................................................17

1

## I.    INTRODUCTION

For approximately sixteen months, Pivot incurred more than $140,000 defending against Lucas Horton's frivolous lawsuit.[1] Horton's claims were premised on a series of phone calls by Rank Media and his buying a Pivot-branded insurance policy from American Health Plans ("AHP"), an independent insurance broker. Months before he filed suit, AHP told Horton that it sold him the policy and hired Rank Media to place the calls, and Rank Media agreed to pay $18,000 to settle his telemarketing claims. Horton had no factual basis to believe he had a claim against Pivot. But he didn't care; he "was going to sue [Pivot] no matter what"—assuming it would pay to avoid a costly defense, like Rank Media did.

When Pivot refused and came forward with even more evidence that it had nothing to do with the calls, Horton got frustrated—he was used to bullying companies. So he engaged in increasingly egregious misconduct. He responded to an evidentiary motion by filing an amended complaint, alleging Pivot itself made the calls—something he now admits was a lie. And when Pivot still refused to pay and served discovery probing his claims, Horton altogether fabricated evidence purporting to show that he demanded a refund from Pivot on October 13, 2022, a prerequisite to his Tex. Bus. Com. § 301.052 claim (the "2022 Refund Demand").

Horton did not dismiss the Underlying Action because he came to his senses and accepted his obligation to refrain from knowingly false claims; he did it to hide his forgery. After months of aggressive litigation, he suddenly caved hours after Pivot told him that it would subpoena his email provider for records proving he fabricated the 2022 Refund Demand. He assumed dismissing his claims would keep his forgery secret. He was wrong.

Horton is an experienced, serial litigant who—by his own account—has initiated "over 60" TCPA lawsuits. He knows the rules and the consequences of asserting false claims and fabricating evidence. In fact, when he attempt to extort Pivot for payment, he

---

[1] *Horton v. PivotHealth*, Case No. 22-cv-02915 (N.D. Tex.) (reassigned to D. Ariz. as Case No. 2:23-cv-02533) (the "Underlying Action").

bragged that his background "dwarfs [Pivot's] experience," and that he "know[s] these laws far better than [Pivot]." Now, confronted with the record of his misconduct, Horton feigns ignorance, leaning on his *pro se* status and asking the Court to absolve him. None of his arguments has merit, for at least six reasons.

First, Horton doesn't even challenge Pivot's claim for wrongful institution of civil proceedings to the extent it is based on Horton's section 301.052 refund claim, or his knowingly false direct liability allegations. He's therefore failed to carry his burden and the Court must deny the motion on that basis. Even setting aside this dispositive point, and as demonstrated in Pivot's affirmative motion for summary judgment, the undisputed record proves each element of Pivot's wrongful prosecution and abuse of process claims. AHP told Horton that it was behind the calls, and Rank Media promised to pay him $18,000. Horton had no factual basis to believe Pivot orchestrated the calls, much less that his claims had a "good chance" of success. On top of that, Horton *still* hasn't moved to set aside his default on Pivot's Requests for Admission, supporting both claims.

Second, Pivot's claims accrued *after* it filed its answer in the Underlying Action, defeating Horton's compulsory counterclaim and *res judicata* arguments. Third, Pivot's initial disclosure is not a basis for summary judgment. The disclosure was appropriate, and Pivot separately identified the scope of its attorneys' fees in the motion-to-dismiss briefing, rendering any alleged deficiency harmless. Horton—who failed to tender his own disclosures—never asked for a supplement. The time to raise any perceived deficiency has long since passed. Horton's own authority confirms that dispositive relief is unavailable under these circumstances. Fourth, Horton conflates the governing standard for wrongful prosecution and abuse of process claims with the standard for punitive damages. Pivot does not need to prove its claims by clear and convincing evidence, and the record would defeat summary judgment under either standard. Fifth, Arizona law provides attorneys' fees for wrongful prosecution and abuse of process. Whether those damages are also available under the TCPA or state law claims Horton raised in the Underlying Action is irrelevant.

Sixth and finally, Horton has come forward with no evidence that the 2022 Refund Demand is authentic. He fixates on the timestamp—offering no reasonable explanation for why the document is captioned "CST" despite allegedly being sent during Daylight Saving Time—while ignoring the remaining evidence proving the file is a forgery, including his own conduct, the file's metadata, and the records maintained by Pivot and Yahoo. If the 2022 Refund Demand were genuine, Horton could have produced a native email file showing that he transmitted the request. Instead, he deleted all records relating to that file after Pivot told him to preserve evidence during his deposition in the Underlying Action. On top of all this, the defaulted Requests for Admission also establish Horton's forgery.

Throughout the Underlying Action, Horton flouted the Court's rules when they stood in the way of his recovery. He asserted knowingly false claims, fabricated evidence, and spoliated records. His actions are antithetical to the integrity of the American Courts. Unless the Court stops him, he will continue to weaponize the courts and take scarce judicial resources from those who need them. The Court should deny Horton's motion for summary judgment and grant Pivot's.

## II.    BACKGROUND

Pivot's and Horton's motions for summary judgment arise from the same largely undisputed factual record. Rather than repeating the extensive background in its affirmative motion, Pivot references and incorporates its statement of material facts here, ECF No. 65 ("Pivot's SOMF"). Pivot will summarize those facts—highlighting a few key details—to the extent necessary to address the legal deficiencies in Horton's motion.

From September to October 2022, Horton received several phone calls from Rank Media on behalf of AHP (the "Calls"). Pivot's SOMF ¶¶ 1, 8. Pivot is an insurance management company (not an insurer or broker), and it has no control over the manner in which AHP or other brokers that might sell its products contact consumers, the vendors those brokers hire, or the coverage they ultimately recommend. Pivot's Response to Horton's Statement of Material Facts, ¶ 41 ("Pivot's Response SOMF"). Horton purchased a Pivot-branded insurance policy from AHP on October 10, 2022, leading Pivot to send

him a routine welcome email. Pivot's SOMF ¶ 4. This is much like when consumers buy a Microsoft Office product at Office Depot as a result of an Office Depot mailer about a sale. When those consumers set up the Microsoft Office product, they might get an email from Microsoft. But that doesn't change that Office Depot, not Microsoft, sent the mailer. Any claim against Microsoft related to the Office Depot mailer would be equally absurd.

In any event, any confusion Horton claims he drew from that welcome email was short-lived—he quickly learned Pivot had nothing to do with the Calls. *Id.* ¶ 7. First, on October 13, 2022, AHP told him that **it hired Rank Media and sold him the policy.** *Id.* ¶ 8. Pivot, on the other hand, told Horton that it had nothing to do with the Calls; it didn't know about them until he served a pre-suit demand, and it didn't even have his phone number until he purchased the policy—after the Calls ended. *Id.* ¶ 12.

Rather than reassess his claims, Horton lashed out at Pivot and attempted to bully it into paying. He told Pivot it was "only digging your own hole you stupid piece of shit. You obviously do not know the law and will find that out soon enough." Pivot Response SOMF ¶ 27. He then tried to leverage his self-professed expertise to extract payment, boasting: "I have been doing this for 3 years and know the laws latter [sic] than you do." *Id.*

In the meantime, Horton sued Rank Media, alleging direct and vicarious telemarketing claims (the "Rank Media Action"). Pivot SOMF ¶ 14. That led Rank Media to pay him $18,000 to settle all his telemarketing claims, confirming that it and AHP—both named in the release—were the ones behind the Calls. *Id.* ¶ 14. Critically, during months of negotiations, neither Rank Media nor AHP suggested Pivot had anything to do with the Calls. *Id.* ¶ 16. On the contrary, when Horton mentioned pursuing Pivot, Rank Media asked: "what is Pivot Health's relationship to the Rank Media case?" *Id.* ¶ 17.

Regardless of whether Pivot was named in the Rank Media release, Horton knew the payment satisfied all direct and vicarious liability he asserted in the Rank Media Action. *Id.* ¶¶ 24–27. Rank Media told him that for $18,000, it "cannot risk being brought into a lawsuit by Pivot for similar violations," and that "[a]ll of your claims against ***any party*** related to phone calls in your complaint must be released." *Id.* ¶ 22. Horton ultimately

4

agreed, telling Rank Media "I found another law pivot broke by not giving me a refund that is 10K a pop. I will get them that way[.]" *Id.* ¶ 24.

Despite uncovering no evidence connecting Pivot to the Calls, Horton concocted a plan to extract a second payment. On December 28, 2022—days before signing the release—he falsely told Pivot that the "agreement with rankmedia fell through." *Id.* ¶¶ 29–32. He then deleted his emails with Rank Media and AHP and later bragged, "I can wipe my butt with that -- those pieces of paper [correspondence with Rank Media] if I want to." *Id.* ¶ 31. Pivot only learned about the Rank Media release a year later, when it began investigating Horton's claims. *Id.* ¶ 32.

By the time Horton filed suit on December 29, 2022, he knew that: (1) Rank Media made the Calls on behalf of AHP, and neither company worked for Pivot; (2) AHP sold him the Pivot-branded policy; and (3) Rank Media agreed to pay $18,000 to settle all of his telemarketing claims. *Id.* ¶ 33. But Horton didn't care about the facts. He was "going to sue [Pivot] no matter what[.]" Pivot Response to SOMF ¶ 30. He assumed it would pay before the case reached the merits. Pivot SOMF ¶¶ 33–34.

When Pivot still refused to pay, Horton got desperate and engaged in increasingly malicious conduct. In response to Pivot's evidentiary motion—further proving that it had nothing to do with the Calls—Horton filed an amended complaint. *Id.* ¶ 35–36. He alleged that Pivot *itself* made the Calls—allegations he now admits he knew were false. *Id.* ¶ 36; ECF No. 54-2, Declaration of Lucas Horton ¶ 9. Due in part to those knowingly false allegations, the Court denied Pivot's motion and transferred the case. Pivot SOMF ¶ 38.

Rather than filing another motion to dismiss, Pivot filed its answer on January 18, 2024, and began investigating Horton's claims. Pivot's Response to SOMF ¶ 42. Horton was frustrated that his strategy to leverage discovery costs was unsuccessful. He knew the evidence would ultimately vindicate Pivot, so he turned to forgery.

As explained in detail in Pivot's affirmative motion, Horton fabricated the 2022 Refund Demand by altering an email he sent Pivot on February 13, 2024—hours after Pivot served discovery asking him for proof he "requested a refund the day after purchasing the

policy." Pivot SOMF ¶¶ 40–43. That request alerted Horton to a fatal defect in his Tex. Bus. Com. § 301.052 claim: he failed to ask for a refund within seven days of purchasing the policy, a prerequisite to liability under the statute. Pivot SOMF ¶ 41.

On March 18, 2024, Horton responded to Pivot's discovery by producing a PDF purporting show a refund demand from lukeduke365@yahoo.com to memberservices@pivothealth.com on October 13, 2022. *Id.* ¶ 46. Pivot had no record of receiving any such email. *Id*. ¶¶ 47–48.[2] And because Horton failed to account for the change between Daylight Saving and Standard Time, the file was stamped "CST," despite purportedly being sent during Daylight Saving Time. *Id.* ¶ 49. These facts led Pivot to suspect that the 2022 Refund Demand was a forgery.

Adding to that suspicion, Horton agreed to abandon his claims immediately after Pivot threatened to subpoena Yahoo for records identifying "the date and time of inbound and outbound email communications" for the lukeduke365@yahoo.com account. *Id.* ¶ 51. After more than 15 months of intransigence and aggressive litigation, he responded an hour later, "I am considering dropping this [case]," also conceding he had no evidence of an "agency relationship." *Id.* ¶ 52. Horton then moved to dismiss his own claims with prejudice. *Id.* ¶ 53. Pivot responded that it did "not oppose the request so long as the dismissal is with prejudice, with Defendant reserving all rights." *Id.* ¶ 54. On April 26, 2024, the Court dismissed the Underlying Action with prejudice. *Id.* ¶ 55. Pivot filed this lawsuit to enforce those rights, to recover the more than $140,000 incurred in defending the fraudulent Underlying Action. *Id.* ¶ 56.

### III.    LEGAL STANDARD

In a motion for summary judgment, the movant bears the initial burden of proving no genuine dispute of material facts exists and is entitled to judgment as a matter of law. *Lerner & Rowe PC v. Brown Engstrand & Shely LLC*, 119 F.4th 711, 717 (9th Cir. 2024); *Margolis v. Ryan*, 140 F.3d 850, 852 (9th Cir. 1998). When the moving party meets its

---

[2] Horton subsequently deleted all evidence related to this file. Pivot SOMF ¶¶ 58–59.

burden, the responding party must "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). As set forth below, Horton fails to carry his initial burden of proving that he is entitled to judgment as a matter of law. And the record set forth in Pivot's affirmative motion for summary judgment establishes that Pivot, not Horton, is entitled to judgment as a matter of law.

## IV.    ARGUMENT

### A.    The Record Proves Wrongful Prosecution and Abuse of Process.

Horton cannot carry his burden of proof because he does not challenge key portions of Pivot's claims, misstates the governing standards, and ignores undisputed evidence establishing lack of probable cause, malice, favorable termination, and abuse of process.

#### i.    *Wrongful Institution of Civil Proceeding.*

As an initial matter, Horton does not challenge Pivot's wrongful prosecution claim arising out of his section 301.052 refund claim or his knowingly false direct-liability allegations. Instead, he focuses exclusively on Pivot's alleged vicarious liability for telemarketing claims. He thus hasn't carried his initial burden with respect to Pivot's wrongful prosecution claim for the refund claim or on direct liability, so his motion must be denied and Pivot's granted. *See Brown,* 119 F.4th at 717 (movant's burden on summary judgment).

And, for the most part, Horton broadly pronounces that there is no evidence to support Pivot's claims. He doesn't substantively grapple with the evidence. As such, the arguments he does make fail.

**Probable Cause**. First, the record proves Horton had no probable cause to allege vicarious telemarketing liability against Pivot. Probable cause has a "subjective *and* objective" component. *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 758 P.2d 1313, 1319 (Ariz. 1988). "[A] defendant's conduct is evaluated not only against an objective standard of reasonableness, but also against his or her subjective state of mind at the time of the alleged wrongdoing." *Cain v. Fid. Nat. Title Ins. Co.*, 2013 WL 988106, at *4 (Ariz. Ct.

App. Mar. 12, 2013). The objective analysis, assessed first, considers whether the litigant (1) had a good chance of establishing his case, (2) advanced a reasonable argument to modify existing law; and (3) conducted a reasonable pre-filing investigation. *Chalpin v. Snyder*, 207 P.3d 666, 672–74 (Ariz. Ct. App. 2008). A "good chance" of success in the wrongful prosecution context is more demanding on litigants than Rule 11's existing law standard. *See id.* at 674–75 (recognizing the heightened standard for defendants, explaining "[i]t may be, however, that an initiator has more than 'no' chance, perhaps 'some' chance, but no reasonable belief that there is a 'good' chance.").

In his motion, Horton (at 5) only addresses the objective component. That alone, is grounds to deny the motion on this point. *See Bradshaw*, 758 P.2d at 1319 (explaining that even where there is an objectively reasonable basis for liability, the initiator may be liable if "he did not have the requisite belief in his claim."). What's more, Horton only addresses (at 5) whether he had a "reasonable ground of suspicion." He says nothing about his pre-suit investigation or whether his claims were supported by existing law, or a good-faith basis to extend that law. Again, this independently precludes judgment on probable cause, even under the objective standard Horton argues.

And based on the information Horton had when he filed suit, he could not reasonably believe he had a "good chance" of proving vicarious liability against Pivot. To allege vicarious liability under the TCPA, Horton needed a factual basis to believe that there was an agency relationship between Pivot and Rank Media ***and*** that Pivot had control over the Calls or ratified that conduct. *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 449 (9th Cir. 2018); *Indian Harbor Ins. Co. v. Valley Forge Ins. Group*, 535 F.3d 359, 364 (5th Cir. 2008).

Horton knows this standard. In *Horton v. SunPath, Ltd.*, he alleged TCPA liability against SunPath, Ltd. after buying a SunPath auto service policy from Northcoast Warranty Services. 2021 WL 982344, at *2, *4 (N.D. Tex. Feb. 16, 2021). He maintained that because SunPath was named as the policy's "administrator," there was "evidence of 'high level cooperation between [SunPath] and Northcoast [the caller]." *Id.* at *4. The Court

8

1   rejected that argument, explaining that simply being named on the policy was not evidence

2   SunPath controlled "the means and details" of the calls. *Id.* Horton simply had no "evidence

3   showing that Defendant played any role in contacting him by phone." *Id.* In other words,

4   that NorthCoast sold a SunPath policy was not evidence of an agency relationship, much

5   less that SunPath controlled the calls in question. *Id.*

6          The facts are far more egregious here and preclude finding that Horton reasonably

7   believed he had a good chance of establishing vicarious liability. He maintains (at 4–5) that

8   because Pivot sent him a welcome email, the policy read "marketed by PIVOTHEALTH,"

9   and Pivot allegedly billed him for the policy, it was reasonable for him to assume Pivot was

10  responsible for everything that happened **before** he purchased the policy. But none of this

11  suggests Pivot **hired** Rank Media or had control over the Calls, as required to support

12  vicarious liability. And whatever Horton believed when he received the welcome email on

13  **October 10, 2022**, he couldn't reasonably believe he had a good chance of proving his

14  claims against Pivot after AHP told him on **October 13, 2022, that it hired Rank Media**,

15  and certainly not after Rank Media agreed to pay him $18,000 to settle his telemarketing

16  claims. Pivot SOMF ¶¶ 8, 20–26. Based on these facts, no reasonable person could believe

17  they had any chance of establishing liability against Pivot, much less a "good chance."

18         That Pivot wasn't named in the Rank Media release doesn't change the fact that by

19  the time Horton initiated the Underlying Action, he had no factual basis to believe Pivot

20  hired Rank Media to place the Calls, much less that there was a good chance of proving his

21  claims. That is dispositive, and Horton's motion fails on this ground alone.

22         What's more, the Rank Media Release satisfied Horton's direct and vicarious

23  telemarketing claims in the Rank Media Action, so his arguments about the parol evidence

24  rule (at 10) miss the mark. He recovered $1,384 per call, which is nearly three times the

25  statutory maximum available under the TCPA (of $500/call), absent evidence of

26  willfulness.[3] The Texas telemarketing claims he asserted don't provide additional damages.

27

28  [3] Horton had no evidence that Pivot was even aware of the Calls, he certainly couldn't
    establish that Pivot intentionally violated the TCPA. Pivot SOMF ¶ 12.

1   *Tatum v. New York Tribeca Grp. LLC*, 2025 WL 2369398, at *7 (E.D. Tex. June 3, 2025)

2   (no additional damages where violations "are based upon the exact same facts—the thirty-

3   four unwanted phone calls from NYTG."). Irrespective of whether Pivot fell within the

4   scope of the release, Horton cannot recover twice for the same claims.

5       **Malice**. The evidence also proves Horton acted with malice. The Court may infer

6   malice based on a lack of probable cause. *Cain*, 2013 WL 988106, at *8. Malice is also

7   present where the defendant "primarily used the action for a purpose other than that of

8   securing the ***proper adjudication*** of the claim." *Bradshaw*, 758 P.2d at 1320 (citing

9   Restatement (Second) of Torts § 676, comment c). For example, malice is proven where

10  the litigant knows his claim is meritless, or where he uses the claim to extort a settlement

11  with no relation to the merits. Restatement § 676 comment c.

12      Horton argues (at 5–6) that because he had probable cause, there can be no malice.

13  As explained above, and in Pivot's affirmative motion, he did not have probable cause, so

14  that argument fails. He also claims (at 6) that simply filing a consumer lawsuit is not

15  malicious. But Horton did far more than file a consumer lawsuit. The record shows he did

16  everything in his power to make the Underlying Action as expensive as possible, hoping to

17  convince Pivot to pay meritless claims. Pivot SOMF ¶ 36. He attacked Pivot counsel,

18  calling him a "stupid piece of shit," lied about the Rank Media release, spoliated his

19  communications with AHP and Rank Media while the Underlying Action was pending,

20  asserted knowingly false direct liability claims, falsified the 2022 Refund Demand, and

21  finally deleted records related to that purported email. *Id.* ¶¶ 13, 28–32, 36–37, 43–49, 58.

22  He never cared about the merits of his claims; he "was going to sue [Pivot] no matter what."

23  Pivot Response SOMF ¶ 30. He just wanted to make the process as expensive as possible

24  to extort a settlement. *Id.* That is quintessential malice.

25      **Favorable Termination.** The Underlying Action was resolved in Pivot's favor.

26  Courts assess whether the party dismissed because "the action was meritless." *Lane v. Terry*

27  *H. Pillinger, P.C.*, 939 P.2d 430, 432 (Ariz. Ct. App. 1997). "[T]he court must evaluate

28  whether the dismissal substantively reflects on the merits, such that, ***if it had been pursued,***

10

1    ***it would surely have resulted in a decision in favor of the defendant.*** *Frey v. Stoneman*,

2    722 P.2d 274, 279 (Ariz. 1986); *see also Trabucco v. Cogan*, 2020 WL 3250860, at *8

3    (Ariz. Ct. App. Apr. 7, 2020) (voluntary dismissal was a favorable termination where the

4    circumstances showed that if defendant proceeded, he would have lost on the merits).

5         Horton maintains (at 6) that because there was no finding of wrongdoing, the

6    dismissal was procedural. But that's not the standard, and the evidence shows the

7    Underlying Action was resolved in Pivot's favor. There's no question that, had the case

8    proceeded, Pivot would have prevailed. Horton baldly claims (at 4) Pivot was "dishonest

9    in discovery," but there simply was no evidence that Pivot hired Rank Media. Pivot SOMF

10   ¶ 52; Pivot Response SOMF ¶ 41. What's more, Horton agreed to dismiss the Underlying

11   Action hours after Pivot told him it planned to subpoena Yahoo, exposing his forgery and

12   jeopardizing his prolific career as a serial litigant. Pivot SOMF ¶¶ 51–52. Finally, while

13   Horton dismissed his claims with prejudice, Pivot reserved its right to bring this action. *Id.*

14   ¶¶ 53–55. Each of these facts independently justifies finding a favorable termination.

15       **Damages.** Finally, the record proves Pivot suffered damages cognizable in a

16   wrongful prosecution claim. Arizona law provides that a wrongful prosecution plaintiff is

17   entitled to recover "expenses "incurred in defending himself against the proceedings,"

18   including "reasonable attorney's fees[.]" Restatement (Second) of Torts § 681; *see also*

19   *Leeker v. Ybanez*, 211 P. 864, 866 (Ariz. 1923) (reversing jury instructions on damages

20   related to "peril of life," but not "attorney's fees incurred or paid by the plaintiff[.]").

21       Horton maintains (at 6–7) that because attorneys' fees are not recoverable under the

22   TCPA, they are not available to Pivot. But Pivot isn't suing under the TCPA, so the question

23   of whether those damages are available under the statute is irrelevant. Pivot initiated a

24   separate action for wrongful prosecution and is entitled to recover the more than $140,000

25   in expenses incurred as a result of defending the Underlying Action. Pivot SOMF ¶ 56.

26         *ii.    Abuse of Process*.

27       Horton's abuse of process argument fares even worse. He deliberately

28   mischaracterizes the claim, asserting (at 7) that Pivot "identifies no misuse of process

whatsoever—no subpoena, writ or execution," and filing of a lawsuit is not grounds for abuse of process. That's simply not true. Pivot's abuse of process claim is based on Horton forging the 2022 Refund Demand during discovery in the Underlying Action. Compl. ¶¶ 56–59; Pivot SOMF ¶¶ 43–49, 58. Using discovery for such an improper purpose falls within the purview of abuse of process. *Nienstedt v. Wetzel*, 651 P.2d 876, 880–81 (Ariz. Ct. App. 1982) (holding that discovery is a "process").

Horton likewise fails to rebut the evidence proving the 2022 Refund Demand is a forgery. He fixates on the timestamp, ignoring the remaining evidence. He points (at 11) to a separate email between lucas@valeriafinejewelry.com and pfitzgerald@wtlaw.com, Pivot's counsel, which Pivot filed in support of its motion for sanctions. ECF No. 25-1, 5.[4] Neither email is associated with a Yahoo account, so the timestamp is irrelevant. But Horton insists (at 11) that because the email is stamped "Eastern Standard Time," despite originating from his email account, the exchange proves that timestamps "can be all over the place with the use of a VPN."

Horton misunderstands the timestamp. Pivot counsel created the PDF file when it filed its motion for sanctions. ECF No. 25-1, ¶ 4. The timestamp reflects when Pivot counsel **received the email,** not when Horton transmitted it. Pivot counsel is located in Atlanta, Georgia, which is why the email is stamped "Eastern Standard Time."

Notably absent from the motion is any email from lukeduke365@yahoo.com, showing a "CST" timestamp on an email that Horton transmitted during Daylight Saving Time. In other words, Horton failed to produce an email recreating the timestamp error he claims led the 2022 Refund Demand's "CST" stamp.[5] By contrast, when Pivot counsel tested the SurfShark VPN, he confirmed it didn't impact the timestamp. Pivot SOMF ¶ 61.

---

[4] His separate argument (at 12) that he did not set his calendar also ignores that, regardless of his calendar settings, his subscriber data lists that his account is associated with "Dallas," "TX." ECF No. 25-1, Page 17 of 39.

[5] Horton emailed Pivot counsel from the lukeduke365@yahoo.com on November 1, 2024 (during Daylight Saving Time), with the subject line "test," presumably attempting to do just that. Pivot Response SOMF ¶ 58.

In any event, as explained in Pivot's affirmative motion, Horton's fixation with the timestamp once again ignores all the other evidence that the 2022 Refund Demand is a forgery. To start, Pivot's records show the **memberservices@pivothealth.com** account never received any refund request on October 13, 2022. Pivot SOMF ¶ 47. Horton failed to produce that email when Pivot told him in December 2022 that it had no record of a refund request—because it didn't exist at that time. *Id.* ¶ 48. By contrast, Pivot did receive the February 2024 Refund Demand, which contained the **exact same opening text** ("Please refund this") and was received by Pivot at the **exact same time** Horton purportedly transmitted the 2022 Refund Demand. *Id.* ¶¶ 42–43.

The 2022 Refund Demand PDF file metadata is further proof. Horton created the file hours after Pivot served its discovery requests in the Underlying Action and about an hour after he transmitted the 2024 Refund Demand. *Id.* ¶ 45.

Yahoo's records are more evidence of forgery. There is no record of the 2022 Refund Demand in the lukeduke365@yahoo.com's "sent" folder, as there would be if Horton transmitted the email, and Yahoo confirmed it did not delete that record. *Id.* ¶ 61.

Horton's conduct likewise confirms forgery. After **years** of pursuing the Underlying Action and ignoring Pivot's evidence that it didn't make the Calls, he agreed to dismiss **an hour** after Pivot told him it was going to subpoena Yahoo for the lukeduke365@yahoo.com email log. Pivot SOMF ¶¶ 51–52. He **then deleted all records related** to the 2022 Refund Demand. *Id.* ¶ 58. Finally, Horton defaulted on Pivot's requests for admission, proving forgery. *Id.* ¶¶ 41–43, 46; *see Am. Gen. Life & Acc. Ins. Co. v. Findley*, 2013 WL 1120662, at *2 (C.D. Cal. Mar. 15, 2013) ("Once a matter has been deemed admitted under Rule 36, even by default, the court may not consider evidence that is inconsistent with the admission.").

As Horton has not addressed any of this evidence, the Court must deny his motion.

      *iii.*    *Burden of Proof and Standing.*

Horton's arguments related to Pivot's burden of proof and standing also fail. Citing *Bradshaw*, he argues (at 9) that Pivot's claims require "clear and convincing evidence,"

1  and he argues, without support, that the Court must therefore enter summary judgment. But
2  *Bradshaw* did not hold that wrongful prosecution and abuse of process claims are subject
3  to a heightened evidentiary standard. Instead, that standard is relevant to "the burden of
4  proof on [] punitive damages[.]" *Bradshaw*, 758 P.2d at 1325. In any event, given the
5  substantive evidence **and** the defaulted requests for admission, Pivot's claims would still
6  doubly survive, even under Horton's incorrect standard. *See Broadband iTV, Inc. v.*
7  *Oceanic Time Warner Cable, LLC*, 135 F. Supp. 3d 1175, 1182 (D. Haw. 2015) (denying
8  judgment under clear and convincing standard).

9       Horton's standing arguments (at 9) fare no better and are essentially just a repeat of
10  the arguments this Court rejected at the pleading stage. ECF No. 35, 3. He claims Pivot has
11  sustained no concrete injury and cites *Steel Co. v. Citizens for Better Environment* for the
12  proposition that a concrete injury cannot be due to litigation expenses in a lawsuit the
13  plaintiff initiated. 523 U.S. 83 (1988). But Pivot's damages include those it incurred during
14  the Underlying Action, which Horton initiated. Pivot's SOMF ¶ 56. Those fees were not
15  self-inflicted; they were the foreseeable consequence of Horton's knowing prosecution of
16  meritless claims and subsequent misuse of discovery.

17       **B.    Horton's Procedural Defenses Fail.**

18       Horton further claims that the Court should enter judgment because the claims are
19  barred by Rule 13 and due to Pivot's initial disclosures. Neither argument has merit.

20            *i.    Pivot's Claims Were Not Compulsory Counterclaims.*

21       First, Pivot couldn't have asserted either of its claims until long after it served its
22  answer in the Underlying Action, so they are not barred by Rule 13. A compulsory
23  counterclaim is "any claim that—**at the time** of [the answer's] service—**the pleader has**
24  **against an opposing party** if the claim: (A) arises out of the transaction or occurrence that
25  is the subject matter of the opposing party's claim; and (B) does not require adding another
26  party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a)(1) (emphasis
27  added). The rule is designed "to prevent multiplicity of litigation and to bring about prompt
28

resolution of all disputes arising from common matters." *Local Union No. 11, Int'l Bhd. of Elec. Workers, AFL–CIO v. G.P. Thompson Elec., Inc.*, 363 F.2d 181, 184 (9th Cir. 1966).

Naturally, a party cannot assert a claim before it accrues. Accordingly, "[a] counterclaim acquired by defendant ***after answering the complaint*** will not be considered compulsory, even if it arises out of the same transaction as does plaintiff's claim." *Haw. Reg'l Council of Carpenters v. Yoshimura*, 2016 WL 4745169, at *6 (D. Haw. Sept. 12, 2016); *Aluminum Trailer Co. v. Sidi Spaces LLC*, 2020 WL 4039095, at *5 (D. Ariz. July 17, 2020) (claim was not compulsory where plaintiff did not know about claim until months after filing its answer); *Johnson v. Con-Vey/Keystone, Inc.*, 856 F. Supp. 1443, 1450 (D. Or. 1994) (acknowledging that Rule 13(a) does not apply to a claim that arises after serving an answer); 6 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1411 (3d ed. 1998) (same)).

Here, both Pivot's wrongful prosecution and abuse of process claims arose months after it filed its answer, meaning neither claim is compulsory. Regarding the former, Pivot had no wrongful prosecution claim until the Underlying Action was favorably terminated. *Frey*, 722 P.2d at 277. Pivot could not bring that claim *at all* while the Underlying Action was pending.

The same goes for Pivot's abuse of process claim. Pivot filed its answer on January 18, 2024. Pivot Response SOMF ¶ 42. Horton did not disclose the forged 2022 Refund Demand—the conduct giving rise to the abuse of process claim—until March 18, 2024. Pivot SOMF ¶ 46. Because the claim had not yet accrued, Pivot had no obligation (or ability) to assert it in its answer.

Horton's reliance on *Pochiro v. Prudential Ins. Co. of Am.* is misplaced. 827 F.2d 1246, 1252 (9th Cir. 1987). In that case, Prudential sued a former employee, John Porchiro, for misappropriating trade secrets. *Id.* at 1250. Porchiro's abuse of process claim was tied to Prudential **initiating a lawsuit, meaning Pochiro had all the relevant facts when he served an answer.** *Id.* at 1252. The Ninth Circuit acknowledged as much, holding that because the claim was related to Prudential's "filing of the lawsuit," it was a compulsory

1    counterclaim. *Id.* at 1253. Here, by contrast, Pivot's abuse of process claim arises from

2    Horton's March 18, 2024 discovery disclosure—months after Pivot filed its answer.

3    *Pochiro*, therefore, does not apply.

4               *ii.   Initial Disclosure.*

5          Horton's initial disclosure argument is frivolous. He maintains (at 11) that Pivot

6    failed to disclose "the depth of his potential exposure" and that this purported deficiency

7    warrants summary judgment. For starters, this is false. Pivot identified the amount of

8    attorneys' fees it incurred defending the Underlying Action in its response to Horton's

9    motion to dismiss, even ***before*** serving its initial disclosures. ECF No. 16, 8.

10         More fundamentally, Horton hasn't identified any authority that Rule 26 is a proper

11    basis for summary judgment under these circumstances. The cases he cites prove the

12    opposite. In both *City & County of San Francisco v. Tutor-Saliba Corp.* and *Allstate*

13    *Insurance Co. v. Nassiri*, the courts addressed the plaintiffs' ***repeated*** failures to supplement

14    disclosures in cases involving complex damages. 218 F.R.D. 219, 220 (N.D. Cal. 2003);

15    2011 WL 2977127, at \*2, \*5 n.4 (D. Nev. July 21, 2011). Even then, however, both courts

16    refused to grant dispositive sanctions. *Nassiri*, 2011 WL 2977127, at \*5 n.4 (refusing to

17    strike); *Tutor-Saliba Corp.*, 218 F.R.D. at 220 (compelling plaintiff to supplement its

18    disclosure). The *Nasiri* court commented that was only appropriate "if the conduct of the

19    party to be sanctioned has been willful, the moving party's ability to obtain a fair trial has

20    been unfairly prejudiced and imposition of lesser sanctions would be inadequate." 2011

21    WL 2977127, at \*5 n.4 (citing *Henry v. Gill Industries*, 983 F.2d 943, 948 (9th Cir.1993)).

22         Horton doesn't come close to meeting that standard. To start, unlike the defendants

23    in those cases, Horton, who failed to serve any initial disclosures, never once asked Pivot

24    to supplement its response, moved to compel, or otherwise raised this purported discovery

25    dispute during fact discovery. Pivot Response SOMF ¶¶ 55–57. Litigation isn't a "game of

26    blind man's buff." *United States v. Procter & Gamble*, 356 U.S. 677, 682 (1958). Horton

27    cannot sleep on his discovery rights, wait until discovery closes, and then convert a

28    purported discovery issue into a dispositive motion.

## V.    CONCLUSION

The record establishes that Lucas Horton initiated the Underlying Action despite having no basis to believe his telemarketing claims against Pivot had a good chance of success. He nevertheless pursued those claims, disregarding the evidence and proceeding on the assumption that Pivot would pay to avoid the expense of litigation, as other defendants had done in the past. Horton had multiple opportunities to reassess his claims in light of the facts. Had he done so, this action would have been unnecessary. Instead, he doubled down—asserting knowingly false allegations and ultimately disclosing fabricated evidence to salvage a meritless claim.

Horton's motion for summary judgment does not confront that record. It misstates the facts and the governing law and offers no basis for judgment as a matter of law. For those reasons, the Court should deny Horton's motion for summary judgment in its entirety.


DATED: January 12, 2026

WATSTEIN TEREPKA LLP

*/s/ Ryan D. Watstein*
Ryan D. Watstein (*admitted pro hac vice*)
ryan@wtlaw.com
Patrick J. Fitzgerald (*admitted pro hac vice*)
pfitzgerald@wtlaw.com
75 14th Street NE, Ste. 2600
Atlanta, Georgia 30309
Tel. (404) 782-0695

*Attorneys for Plaintiff*
*PivotHealth Holdings, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on January 12, 2026, I caused a true and correct copy of the foregoing to be electronically filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record and via email and U.S. first class mail, postage prepaid as follows:

Lucas Horton
1202 Stratford
Richardson, TX 75080
Email:  lukeduke365@yahoo.com

*/s/ Ryan D. Watstein*
Ryan D. Watstein