**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

PivotHealth Holdings LLC,

Plaintiff,

v.

Lucas B. Horton,

Defendant.

No. CV-24-01786-PHX-SHD

**ORDER**

Pending are Defendant Lucas Horton's Motion for Summary Judgment (Doc. 61), and Plaintiff PivotHealth Holdings LLC's ("Pivot") Motion for Summary Judgment and Contempt (Doc. 64). The motions are fully briefed. (Docs. 70, 74, 78, 79.) For the reasons below, Horton's motion will be **denied**, and Pivot's motion will be **granted**.[1]

## I. BACKGROUND

In 2022, Horton sued Pivot for allegedly violating the Telephone Consumer Protection Act ("TCPA") and Texas Business and Commerce Code ("Texas Code") sections 305.053 and 301.052.[2] *See Horton v. PivotHealth Holdings LLC,* No. 3:22-cv-02915 (N.D. Tex. filed Dec. 29, 2022), *transferred,* No. 2:23-cv-02533-MTM (D. Ariz.) (the "*Underlying Action*"). The TCPA makes it unlawful to "transmit[] a telephone solicitation" to telephone numbers listed on the National Do Not Call Registry. 47 U.S.C. § 227(c)(3)(F). Texas Code section 305.053 provides a state-law remedy for violations of

[1] I find these motions suitable for decision without oral argument. *See* LRCiv 7.2(f).

[2] Unless otherwise noted, these facts are undisputed.

the TCPA, allowing plaintiffs to recover up to $1,500 for each violation, or "three times the plaintiff's actual damages." Tex. Bus. & Com. Code §§ 305.053(a), (c). Section 301.052 makes it unlawful to sell services "through the use of a telephone solicitor" without guaranteeing that the consumer can receive a full refund if they request one within seven days of receiving the services. *Id.* § 301.052(1)(A).

In the *Underlying Action*, Horton alleged that Pivot called him 14 times on a phone number that was listed on the National Do Not Call Registry, that he purchased an insurance policy from Pivot as a result, that he requested a refund, and that Pivot refused to give him one. *See Underlying Action*, Doc. 3. Pivot denied Horton's allegations. *Id.*, Doc. 52. Eventually, Horton voluntarily dismissed the case. *Id.*, Doc. 67.

Now, Pivot sues Horton for wrongful institution of a civil action and abuse of process. (*See* Doc. 1.) Pivot alleges that Horton's 2022 suit was brought in bad faith, with the sole purpose of extorting a settlement from Pivot based on meritless claims, and that Horton fabricated and spoliated evidence during the prosecution of his case. (*Id.*) I therefore turn to the events giving rise to Horton's 2022 suit and the litigation that followed.

**A. The Phone Calls and Horton's Purchase of a Pivot-Branded Policy**

Horton's phone number ending in 0625 has been listed on the National Do Not Call Registry since June 2020. (Doc. 77 at ¶ 1; Doc. 71 at ¶ 1.) Between September 6 and October 10, 2022, Horton received 14 calls on his 0625 number (the "Calls"). (Doc. 65 at ¶ 1; Doc. 74-1 at ¶ 1.) During the fourteenth call, on October 10, 2022, Horton bought a Pivot-branded health insurance policy ("the Policy") from American Health Plans ("American Health"), an independent insurance broker. (Doc. 65 at ¶ 3; Doc. 74-1 at ¶ 1.) Horton bought the Policy to find out who was responsible for the Calls. (Doc. 77 at ¶ 23; Doc. 65 at 422.) After the purchase, Horton's credit card was charged by "Pivot Health." (Doc. 77 at ¶ 6; Doc. 71 at ¶ 6.) He also received a welcome email from Pivot; a welcome packet with "Marketed by PivotHealth" displayed on the cover page; an email inviting him to create a profile in the "Pivot Health Member Portal"; and an ID card bearing Pivot's name and phone number. (*See* Doc. 77 at ¶ 6; Doc. 71 at ¶ 6; Doc. 65 at ¶ 4; Doc. 74-1 at

¶ 1.)

### B. Horton Demands Settlement of His Claims

On October 11, 2022, one day after Horton purchased the Policy, Horton emailed American Health with a settlement demand. (Doc. 65 at 334.) He attached a proposed complaint to the email, explaining that he would file it at the end of the week "if he did not get some sort of response" from American Health within two business days. (*Id.*) Horton added, "in case you think I am bluffing, here are 3 of the suits I successfully dealt with in Federal Court," and provided links to three other TCPA lawsuits. (*Id.*)

Two days later, on October 13, 2022, Reese Serra, an attorney for American Health, responded to Horton. (Doc. 65 at 333.) Serra explained that the calls Horton received came from a third-party provider called Rank Media, and described the call during which Horton purchased the Policy:

> On October 10, 2022 a live transfer lead came in to AHP from Rank Media, with you (Lucas Horton) in Richardson, TX on the line. The live transferred call was answered by our agent Katie Kreucher. You then proceeded to explain to Katie your insurance needs and submitted a "dummy" health insurance application.
>
> The call AHP received with you on the line was from a third-party provider called Rank Media, who sends leads to AHP from parties who are interested in obtaining health insurance. Our agreement with Rank Media indicates that all of the leads referred to us have provided consent, in compliance with the TCPA. We have forwarded a copy of your complaint and e-mail to Rank Media. We have confirmed with Rank Media that consent was received. Further, for clarity, AHP does not use robodialers, ATDSs, or pre-recorded messages, and does not contact parties without their express permission.
>
> As indicated by [our telephone provider and dialer], AHP does not own or use the numbers referenced in the complaint. AHP never called you or requested any third party to call you. In light of these facts, and to avoid the costs and expenses associated with litigation, AHP would be willing to sign a settlement agreement containing a no contact provision.

(*Id.*)

A few hours after Serra sent this explanation to Horton, Horton emailed a settlement demand to Pivot. (*See* Doc. 65 at 333; *id.* at 435.) He again attached a proposed complaint alleging violations of the TCPA, and informed Pivot that if he did "not receive some sort of response" within three business days, he would file the attached complaint. (*Id.* at ¶ 6;

*id*. at 435; Doc. 74-1 at ¶ 1.) Horton also listed three of his "many successful TCPA cases," in case Pivot thought he was "bluffing." (Doc. 65 at 334.)

Four days later, on October 17, 2022, Pivot's counsel, David Kaminsky, contacted Horton, requesting to discuss the demand over the phone. (*Id.* at 428.) Horton replied: "I have figured out who actually called me, which is who I really want to sue. They are called RankMedia." (*Id.*) Horton then asked if Pivot had an agreement with RankMedia or with American Health, and requested information that "absolves Pivot of these calls." (*Id.*)

Over the next few days, Horton sent several emails acknowledging that Pivot did not call him. (*See, e.g.*, *id.* at 427 ("I never said pivot [sic] called me."); *id.* at 426 ("Are you still going to try and claim that pivot [sic] isn't liable since they didn't call me?"); *id.* ("I would go after rank media [sic] but they can't afford this and would probably ignore it. Maybe by going after Pivot they will be more selective with whom they let market their products.").) Horton nonetheless insisted Pivot was still liable for the calls. (*Id.* at 426–27.) He requested that Kaminsky "look up vicarious liability and ratification" and insisted that "Pivot is on the hook" because it is "liable once [it] takes [any] monetary benefit from the calls." (*Id.*) Kaminsky reaffirmed several times that Pivot did not make any of the Calls. (*See, e.g.*, *id.* at 427 ("PivotHealth did not call you, nor did they provide information about you to Rank Media.").)

During this exchange, on October 23, 2022—13 days after he purchased and received the Policy—Horton requested that his policy be cancelled and "any payments refunded." (*Id.* at 426; Doc. 61 at 19.) Kaminsky told Horton that Pivot would consider "resolving" his "purchase of a policy" and requested that Horton send Pivot "a full copy of the subject policy and policy information" he claimed to have purchased. (Doc. 65 at 423.) Horton requested a refund several more times over the next few weeks, but he did not send a copy of the Policy or any other information to Kaminsky.[3] (*See id.* at 420–23.)

---

[3] Horton does not dispute any of the following emails or their contents, though he disputes Pivot's characterization of their legal significance. (*See, e.g.*, Doc. 74-1 at ¶ 8 (explaining that he "doesn't dispute" the email communications or their contents but asserting that "just because this is true doesn't mean that [American Health] wasn't hired

### C. Horton's Suit Against Rank Media and Settlement Discussions

On November 4, 2022, Horton filed suit against Rank Media. *Horton v. Rank Media USA LLC*, 3:22-cv-02476 (N.D. Tex. Nov. 4, 2022) (the "Rank Media Action"). There, he alleged that Rank Media was responsible for the Calls under the TCPA and Texas Code section 305.053. *Id.*, Doc. 3 at ¶ 9. Rank Media did not deny making the calls and did not indicate that it had any relationship with Pivot. (Doc. 65 at ¶ 16; Doc. 74-1 at ¶ 15.) When Horton mentioned his claims against Pivot to Rank Media's attorney, Michael Maxvill, Maxvill responded, "I need clarification – what is Pivot Health's relationship to the Rank Media case?" (Doc. 65 at ¶ 17; Doc. 74-1 at ¶ 15; Doc. 65 at 472.)

On December 5, 2022, Maxvill and Horton began negotiating a settlement via email.[4] (Doc. 65 at 476.) Rank Media repeatedly made offers contingent upon Horton's "release of claims against Rank Media and any other potential parties [arising] from the phone calls alleged in [Horton's] complaint." (*Id.* at 473.) On December 15, 2022, Horton sent Maxvill an email that said "Make it 18k and you have a deal. However, I am only releasing rank media [sic] and the other company you represent. I am not releasing pivot health [sic]." (*Id.* at 472.) Maxvill accepted the $18,000 offer and reiterated that the settlement would release all claims arising from the Calls "regardless of who actually made the calls." (*Id.*) Horton agreed, "as long as it doesn't include Pivot Health." (*Id.*) In response, Maxvill told Horton that the release of claims against Pivot was "a deal breaker":

> Are you telling me you do not want to include a release against Pivot in your settlement with Rank Media? If so, that is a deal breaker. For $18,000, Rank Media cannot risk being brought into a lawsuit by Pivot if you sue Pivot for similar violations. All of your claims against any party related to phone calls in your complaint must be released.

(*Id.* at 471.)

---

by Pivot"); *id.* at ¶ 9 (same).)

[4] Although Horton does not dispute the content of these email communications, he does contest their legal significance and objects to their admissibility, arguing they violate the parol evidence rule. (*See* Doc. 74-1 at 3–4.) I address Horton's evidentiary objections below. *See infra* Section II(C)(2).

Initially, Horton refused to settle if the release included claims against Pivot. (*See id.* at 470–72.) But on December 20, 2022, Horton acquiesced. He told Maxvill to "[g]o ahead and send the agreement for 18k," explaining that he "found another law pivot [sic] broke by not giving [him] a refund that is 10k a pop" and that he would "get them that way." (*Id.* at 470.)

Later that day, Horton notified Pivot that "[he] would be settling with Rankmedia [sic], who actually made the calls and will be absolving them and anyone else for the TCPA and TX 305 violations." (*Id.* at ¶ 27; *id.* at 419; Doc. 74-1 at ¶ 27.) He stated that Rank Media "made sure" the settlement "included [Pivot]," and explained that while Pivot was "out of the woods for those violations" he still intended to file suit under Texas Business and Commerce Code section 301.052 because Pivot did not refund him. (Doc. 65 at 419; *see also id.* at 417 ("I am settling with rank media [sic] and they are forcing me to absolve pivot [sic] as well.").)

**D. Pivot Informs Horton of Refund Procedure**

On December 27, 2022, a different attorney for Pivot, Mark Henrickson, responded to Horton and explained that he would be taking over the case. (*Id.* at 418–19.) He told Horton that Horton had not properly requested a refund or cancellation of his Policy. (*Id.*) Henrickson explained that Horton's "prior emails" to Kaminsky "were in regard to [his] TCPA demands and were not any form of cancellation notice to Pivot." (*Id.*) Henrickson further explained that those demands were made to "an attorney in private practice who . . . ha[d] no ability to facilitate a cancellation of [Horton's] policy," and that Pivot "could find no record of" Horton's refund or cancellation request. (*Id.*) Henrickson then told Horton that he would be "happy to follow up with Pivot's customer service department" regarding the refund, if Horton could tell him "who [Horton] notified at Pivot Health *and* send . . . a copy of the written notice [Horton] provided." (*Id.* (emphasis in original).) Henrickson directed Horton to Pivot Health's website for further assistance with cancelling his Policy. (*Id.*)

Horton responded: "I do not give a shit about requesting the refund correctly. I

requested it and that douchebag should have issued it and stopped the billing." (*Id.* at 417–18.)

### E. Horton Sues Pivot and Settles with Rank Media

On December 28, 2022, Horton told Pivot that his "agreement with rankmedia [sic] fell through." (Doc. 65 at ¶ 29, 416; Doc. 74-1 at ¶ 29.)[5] The next day, Horton sued Pivot in the Northern District of Texas, seeking relief for alleged violations of the TCPA and Texas Code sections 305.053 and 301.052. *Underlying Action*, Doc. 3. (Doc. 65 at ¶¶ 1, 34; Doc. 74-1 at ¶ 1.) His complaint alleged that Pivot's "agents place unwanted telemarketing calls to solicit consumers to purchase health insurance," and that "[a]ll the calls at issue were made on by or [sic] behalf of, for the benefit of, or with the knowledge and with the approval of" Pivot. *Underlying Action*, Doc. 3 at ¶¶ 16–17. Horton also alleged that he requested a refund on October 23, 2022 "from David Kaminsky, an attorney who contacted [Horton] on Oct. 17th about his claims," but that a refund was never issued. *Id.* at ¶¶ 13–14.

On December 30, 2022—one day after he filed suit against Pivot and two days after he told Pivot that the settlement with Rank Media "fell through"—he settled with Rank Media, signing a release (the "Rank Media Release" or "Release") that provides in part:

> Plaintiff hereby RELEASES . . . Defendant . . . and any other party whatsoever ("Released Parties") from any and all claims . . . arising out of . . . the Lawsuit. . . . This Release includes all solicitations listed by Plaintiff in the Lawsuit and all other solicitations made to Plaintiff by Defendant and/or the Released Parties through the date of this Agreement.

(Doc. 65 at ¶ 26; Doc. 74-1 at ¶ 26; *see also* Doc. 77 at 1; Doc. 71 at ¶ 4.) Pivot was not specifically named in the Release. (Doc. 77 at 1; Doc. 74-1 at ¶ 26; Doc. 71 at ¶ 4.)

Horton deleted his email exchanges with American Health and Rank Media after the settlement's execution. (Doc. 65 at ¶ 30; Doc. 74-1 at ¶ 30.) He testified that he did so "[p]robably right after I -- the day or so after I signed the agreement with [Rank Media]." (*Id.*) Horton asserts that he deleted the emails because he "deletes stuff when he thinks he

---

[5] Horton's statement that the settlement "fell through" is addressed in greater detail in Section II(D)(1)(a).

[is] finished with them" and believed he no longer needed the emails after settling. (Doc. 74-1 at ¶ 30.) At no point did Horton tell Pivot that he settled with Rank Media. (*See* Doc. 65 at ¶ 32; Doc. 74-1 at ¶ 32.)

Meanwhile, in the *Underlying Action*, Pivot moved to dismiss Horton's complaint. *Underlying Action*, Doc. 9. Among other things, Pivot argued that Horton failed to allege that Pivot made the calls and further failed to allege that Horton had appropriately requested a refund. *Id.* In response, Horton filed an amended complaint. *Id.*, Doc. 13. There, he alleged "[Pivot] places unwanted telemarketing calls to solicit consumers to purchase health insurance policies," that "[Pivot] made the calls," and that "[a]t this point, there is no way to know who made the calls. But the fact that the Defendant has directly billed the Plaintiff would point to them making the calls." (Doc. 65 at ¶ 36; Doc. 74-1 at ¶ 36.) *Underlying Action*, Doc. 13 at ¶¶ 13, 30–34. He also alleged for the first time that he requested a refund the day after he purchased the Policy and removed the allegation that he requested a refund on October 23, 2022 from Kaminsky. (*Compare Underlying Action*, Doc. 3 at ¶¶ 13–14, *with id.*, Doc. 13 at ¶¶ 3, 25.) Horton filed his amended complaint on March 2, 2023, two months after he executed his settlement with Rank Media. *See Underlying Action*, Doc. 13. (Doc. 65 at ¶ 25; Doc. 74-1 at ¶ 24.)

Horton later testified that he "never said Pivot physically made the calls" in the *Underlying Action* and that any indication to the contrary in his complaint was a "typo" because he "knew pivot [sic] didn't . . . pick up the phone and dial my number." (Doc. 65 at ¶ 37; Doc. 74-1 at ¶ 37.) He continues to insist that Pivot "takes the wording in the [amended complaint] too literally" and that "Horton ALWAYS knew that Pivot did not PHYSICALLY make the calls." (Doc. 74-1 at ¶ 37.)

Pivot filed a second motion to dismiss. *Underlying Action*, Doc. 21. On November 16, 2023, the magistrate judge recommended denying Pivot's motion to dismiss, reasoning that Horton may be entitled to discovery to identify "who made the calls." (Doc. 65 at ¶ 38; Doc. 74-1 at ¶ 38.) On December 7, 2023, the *Underlying Action* was transferred to this District. (Doc. 65 at ¶ 39; Doc. 74-1 at ¶ 38.)

### *F.* Horton Produces the 2022 Refund Demand in the *Underlying Action*

On February 13, 2024, at 9:15 a.m. Eastern Standard Time, Pivot served its first discovery requests in the *Underlying Action* on Horton. (Doc. 65 at ¶ 40; Doc. 74-1 at ¶ 40.) Among other things, it sought evidence supporting Horton's allegation that he "requested a refund the day after purchasing the policy." (*Id.*) At 11:29 a.m. Eastern Standard Time (10:29 a.m. Central Standard Time) on February 13, 2024, a few hours after Pivot requested evidence that Horton submitted a timely refund, Horton emailed memberservices@pivothealth.com, writing "Please refund this" (the "2024 Refund Demand"). (Doc. 65 at ¶ 42.)

On March 18, 2024, Horton served discovery responses. (Doc. 65 at ¶ 46; Doc. 74-1 at ¶ 46.) They included a PDF purporting to show an email from lukeduke365@yahoo.com to memberservices@pivothealth.com dated "October 13, 2022 at 10:29 AM CST" (the "2022 Refund Demand"). (Doc. 71 at ¶ 8; Doc. 77 at ¶ 8; *see also* Doc. 65 at ¶ 46.)

The parties dispute whether Horton fabricated the 2022 Refund Demand. Pivot asserts that Horton doctored the 2024 Refund Demand to create the 2022 Refund Demand based on the following evidence:

- The 2022 Refund Demand bears the same clock time (10:29 a.m. Central, or 11:29 a.m. Eastern)—and the same opening text ("Please refund this.")—as the 2024 Refund Demand. (Doc. 65 at ¶¶ 43–44.)
- According to its metadata, the 2022 Refund Demand PDF was created on February 13, 2024, at 11:36 a.m., just seven minutes after Horton sent the 2024 Refund Demand. (*Id.* at ¶ 45.)
- The 2022 Refund Demand is stamped "CST" even though October 13, 2022—the date it was purportedly sent—fell during daylight saving time and, therefore, if authentic it would have been stamped "CDT." (*Id.* at ¶ 49.)

Horton argues that "there is [no] real evidence to support" Pivot's contentions and

states he did not fabricate the 2022 Refund Demand.[6] (Doc. 74-1 at ¶¶ 42–49.) Horton admits that he deleted all email records related to the 2022 Refund Demand. (Doc. 65 at ¶ 58; Doc. 74-1 at ¶ 58.)

In April 2024, during his deposition in the *Underlying Action*, Horton testified that the 2022 Refund Demand was authentic and that Yahoo would have records of the email "[i]f it goes back that far." (Doc. 65 at ¶ 50; Doc. 74-1 at ¶ 50.) After the deposition, Pivot told Horton it planned to subpoena Yahoo for the date and time of Horton's inbound and outbound emails. (Doc. 65 at ¶ 51; Doc. 74-1 at ¶ 50.) Horton responded, "I am considering dropping [the *Underlying Action*]," and acknowledged that a relationship between Pivot and the caller "can't be proved very easily." (Doc. 65 at ¶ 52; *see* Doc. 74-1 at ¶ 52.)

### G. Dismissal of the *Underlying Action*

On April 23, 2024, four days after Pivot told Horton it would subpoena Yahoo to corroborate the existence of the 2022 Refund Demand, Horton moved to dismiss his claims in the *Underlying Action* with prejudice. (Doc. 65 at ¶ 53; Doc. 74-1 at ¶ 53; Doc. 65 at 338.) *Underlying Action*, Doc. 65. Pivot did "not oppose the request so long as the dismissal is with prejudice, with Defendant reserving all rights." (Doc. 65 at ¶ 54; Doc. 74-1 at ¶ 53.) On April 26, 2024, the Court granted Horton's motion and dismissed the *Underlying Action* with prejudice. (Doc. 65 at ¶ 55; Doc. 74-1 at ¶ 53.) Pivot asserts that it incurred more than $140,000 in attorneys' fees defending the *Underlying Action*. (Doc. 65 at ¶ 56.)

### H. This Action

On July 19, 2024, three months after Horton dismissed the *Underlying Action*, Pivot filed this case against Horton for wrongful institution and continuation of civil proceedings and abuse of process. (Doc. 1.) After I denied Horton's motion to dismiss, (Doc. 35), the

---

[6] Horton's Response states, "There is real evidence to support this," but when read in context, he clearly intended to state, "There is [*no*] real evidence to support this." (*See* Doc. 74-1 at ¶¶ 42–44, 46.) I will construe this omission of "no" as a typo, rather than a concession.

parties engaged in discovery and Horton answered the complaint, (Docs. 91, 92).

On December 2, 2025, Horton moved for summary judgment. (Doc. 54.) He filed an amended motion the next day. (Doc. 61.) Pivot responded, (Doc. 70), and Horton replied, (Doc. 78). On December 5, 2025, Pivot filed its own motion for summary judgment. (Doc. 64.) In addition to seeking summary judgment on all claims, Pivot requests that I find Horton in contempt of court for his behavior at his deposition.[7] (*Id.*) Pivot's motion for summary judgment and contempt is fully briefed. (Docs. 74, 79.)

## II. MOTIONS FOR SUMMARY JUDGMENT

### A. Legal Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Not all facts are material, and not all disputes are genuine. A "fact is 'material' only if it might affect the outcome of the case, and a dispute is 'genuine' only if a reasonable trier of fact could resolve the issue in the non-movant's favor." *Fresno Motors, LLC v. Mercedes Benz USA, LLC*, 771 F.3d 1119, 1125 (9th Cir. 2014). Courts "must view the evidence in the light most favorable to the nonmoving party and draw all reasonable inference[s] in the nonmoving party's favor." *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 459 (9th Cir. 2018).

The moving party bears the initial burden of "identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Then, the burden shifts to the nonmoving party to "cit[e] to particular parts of materials in the record" to establish that a genuine issue of material fact *does* exist. Fed. R. Civ. P. 56(c)(1); *see also Celotex*, 477 U.S. at 322–23. Even pro se litigants must marshal some evidence to support their claims. *Cornelio v. Wassermann*, 2012 WL 3028344, at *2 (D. Ariz. July 24, 2012), *aff'd*, 582 F. App'x 717 (9th Cir. 2014) ("A pro se nonmoving party must still present some significant

---

[7] I address Horton's behavior at his deposition in further detail below. *See infra* Section III(B).

probative evidence . . . to survive summary judgment." (quotation marks omitted)).

**B. Horton's Threshold Legal Arguments**

Horton argues that Pivot's claims are precluded as a matter of law. First, he argues that Pivot lacks standing to sue, and second, that Pivot's claims are barred by res judicata and Federal Rule of Civil Procedure 13(a). (*See* Doc. 61 at 7–10, 13.) I address Horton's two threshold arguments first.

**1. Standing**

I previously rejected Horton's standing argument when I denied his motion to dismiss, finding that Pivot had adequately alleged an injury in fact—fees incurred in the *Underlying Action* and reputational harm—that was caused by Horton's conduct and redressable by a decision in Pivot's favor. (Doc. 35 at 3–5.) At summary judgment, however, allegations do not suffice; Pivot must demonstrate harm with competent evidence to establish standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (holding that at summary judgment, "the plaintiff can no longer rest on . . . mere allegations" and "must set forth by affidavit or other evidence specific facts" establishing Article III standing (quotation marks omitted)).

Pivot has done so. Pivot presents evidence that it incurred more than $140,000 in attorneys' fees defending the *Underlying Action*. (Doc. 65 at ¶ 56.) Monetary harm is a concrete injury. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) (recognizing that monetary harms "readily qualify as concrete injuries under Article III").

Horton argues that Pivot "cannot achieve standing to litigate a substantive issue by bringing suit for the cost of bringing suit." (Doc. 61 at 9–10 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998)).) This argument misapprehends the nature of Pivot's complaint. Unlike the plaintiffs in *Steel Co.*, Pivot does not rely on the cost of the present suit to establish its Article III injury. *See* 523 U.S. at 107. Rather, Pivot's injury is the harm it suffered because of the *Underlying Action*, which it argues Horton brought—and litigated—wrongfully. Pivot's fees in the *Underlying Action* are sufficient to establish Article III standing. And because Pivot has shown one concrete injury, I need not decide

whether its claimed reputational harm would independently suffice; whether Pivot may recover for that separate harm is a question of damages, not standing.

**2. Res Judicata**

Horton next argues that Pivot's claims are barred by res judicata because Pivot should have brought its claims as counterclaims in the *Underlying Action* under Federal Rule of Civil Procedure 13(a). (Doc. 61 at 7–8, 13.) Because the *Underlying Action* was litigated in federal court and arose under federal law, federal law governs the preclusive effect of its judgment. *Taylor v. Sturgell*, 553 U.S. 880, 891 n.4 (2008). Claim preclusion bars "any claims that were raised or could have been raised in the prior action." *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001). A former defendant's unasserted claim is barred if it was a compulsory counterclaim. *See Pochiro v. Prudential Ins. Co. of Am.*, 827 F.2d 1246, 1249 (9th Cir. 1987). Federal Rule 13(a), which governs compulsory counterclaims, requires a party to plead only those claims "the pleader has against an opposing party" "at the time of [the pleading's] service." Fed. R. Civ. P. 13(a)(1); *see Pochiro*, 827 F.2d at 1251 (a compulsory counterclaim "need only have accrued by the time a responsive pleading is filed in the first action"). Arizona follows the same rule. *Lansford v. Harris*, 850 P.2d 126, 132 (Ariz. Ct. App. 1992) ("[A] claim must be 'mature' to be compulsory."); *Occidental Chem. Co. v. Connor*, 604 P.2d 605, 609 (Ariz. 1979). The result is therefore the same under either body of law.

Here, neither of Pivot's claims against Horton had "matured" when Pivot served its Answer in the *Underlying Action*. (Doc. 71 at ¶ 42; *see* Doc. 78 at 1 (Horton acknowledging that Pivot's claims "accrued after [Pivot] filed its answer").) A wrongful institution claim requires that the prior action end in the claimant's favor. *Bradshaw v. State Farm Mut. Auto. Ins. Co.*, 758 P.2d 1313, 1318–19 (Ariz. 1988). Pivot's wrongful institution claim thus could not have accrued before Pivot filed its answer on January 18, 2024, because the *Underlying Action* did not terminate until April 26, 2024. (Doc. 65 at ¶ 55.)

Similarly, Pivot's abuse of process claim rests on Horton's production of the 2022

Refund Demand, which happened on March 18, 2024, two months *after* Pivot answered Horton's complaint. (Doc. 65 at ¶ 46; Doc. 74-1 at ¶ 46.) Pivot could have asserted that later-arising claim by supplemental pleading, Fed. R. Civ. P. 13(e), but it was not required to do so. And its decision not to do so has no preclusive effect. *See Anspach v. Meyer*, 2014 WL 345676, at *7–8 (D. Ariz. Jan. 30, 2014) (holding that defamation claims arising from statements made before the plaintiff filed its answer in the prior action were barred by Rule 13(a), but defamation claims arising from statements made after the plaintiff filed its answer were "not subject to dismissal as compulsory counterclaims"). Because Pivot's claims were not compulsory counterclaims under Rule 13(a), they are not barred by res judicata.

### C. Evidentiary Issues

In addition to the threshold issues resolved above, the parties' briefing poses two evidentiary issues that I resolve before turning to the merits of Pivot's claims: (1) whether Horton's failure to respond to Pivot's requests for admission should be deemed admissions to facts warranting summary judgment, and (2) whether the parol evidence rule applies to this case.

#### 1. Pivot's Requests for Admission

Under Rule 36, a request for admission is deemed admitted if the responding party does not answer or object within 30 days, and the admission is "conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Fed. R. Civ. P. 36(a)(3), (b); *Conlon v. United States*, 474 F.3d 616, 621 (9th Cir. 2007). Deemed admissions may support summary judgment. *Conlon*, 474 F.3d at 621.

Pivot served Horton with requests for admission that, if deemed admitted, would establish key elements of Pivot's claims. (*See, e.g.*, Doc. 65 at 387 ("Admit that you knew that your [TCPA] claim in the *Underlying Action* was not meritorious"); *id.* at 388 ("Admit that You forged the Refund Demand").) Horton did not respond to Pivot's requests for admission because he believed they were premature. (Doc. 74 at 4; Doc. 78 at 5.) In its motion for summary judgment, Pivot disclaimed any reliance on its requests for admission,

explaining that it "chose to prove the merits of its claims, rather than simply resting on Horton's default." (Doc. 64 at 6 n.1.) In reply, however, Pivot argues that the requests "alone establish Pivot's claims" and are "alone dispositive." (Doc. 79 at 3–4.)

I need not resolve whether the requests for admission are deemed admitted. As explained below, Pivot is entitled to summary judgment on the unrebutted evidence. I therefore decide the parties' motions on the evidentiary record without relying on Horton's failure to respond to the requests for admission.

**2. Parol Evidence Rule**

Horton objects to Pivot's reliance on his December 2022 email correspondence with Rank Media's counsel, Michael Maxvill, based on the parol evidence rule. Specifically, he argues that the rule precludes my consideration of those emails because the Rank Media Release is unambiguous and does not expressly name Pivot. (Doc. 61 at 10.)

In Arizona, the parol evidence rule "prohibits the introduction of extrinsic evidence to vary or contradict, but not to interpret, an agreement." *Jinro Am. Inc. v. Secure Invs., Inc.*, 266 F.3d 993, 999 (9th Cir.), *opinion amended on denial of reh'g*, 272 F.3d 1289 (9th Cir. 2001).[8] Evidence of "[a]greements and negotiations prior to or contemporaneous with" a writing is admissible to establish "the meaning of the writing." Restatement (Second) of Contracts § 214 (1981); *see Jinro*, 266 F.3d at 999 (noting that Arizona courts follow the Restatement). Thus, to the extent Pivot offers the Maxvill emails to establish the meaning of the Rank Media Release, they are admissible so long as they do not vary or contradict its terms.

Contrary to Horton's argument, the emails do not contradict the Release's terms. The Release states that Horton released Rank Media "and any other party whatsoever . . . from any and all claims" arising out of the Calls. (Doc. 65 at ¶ 26; Doc. 74-1 at ¶ 26; *see also* Doc. 77 at 1; Doc. 71 at ¶ 4.) The emails—in which Rank Media refused to settle

---

[8] The parties do not address which state's law governs the Rank Media Release. Because neither party contends that the law of another state differs from Arizona's on this point, I apply Arizona law.

unless Horton agreed to release his claims as to all potential defendants, including Pivot, and Horton eventually capitulated and agreed to release Pivot—are consistent with this broad language. (*See* Doc. 65 at 470–73.) Indeed, any ambiguity caused by the fact that Pivot was not specifically named in the Release is resolved by reference to the Maxvill emails. Far from "varying" or "contradicting" the agreement's terms, the Maxvill emails reinforce the plain meaning of the agreement: that, for $18,000, Horton released "any and all claims" against Rank Media and "any other party whatsoever." The parol evidence rule therefore does not bar consideration of the Maxvill emails to interpret the Rank Media Release.

To the extent the Maxvill emails are offered to establish what Horton knew and believed when he filed and continued the *Underlying Action*—which is a necessary element of Pivot's wrongful-institution claim independent of the Rank Media Release—the parol evidence rule is inapplicable. *See Bradshaw*, 758 P.2d at 1319 (holding that wrongful-institution turns on whether "[t]he initiator of the action . . . honestly believe[d] in its possible merits" and whether that belief was objectively reasonable). The parol evidence applies only to the interpretation of contracts. Horton's objection to the Maxvill emails is overruled.

**D. Wrongful Institution of Civil Proceedings**

Having dispensed with the threshold and evidentiary issues, I turn now to Pivot's wrongful institution of civil proceedings claim. To prevail on such a claim, a plaintiff must prove that the defendant "(1) instituted a civil action which was (2) motivated by malice, (3) begun without probable cause, (4) terminated in plaintiff's favor and (5) damaged plaintiff."[9] *Bradshaw*, 758 P.2d at 1318–19. The claim is not limited to the act of filing

[9] Horton contends that Pivot must prove both of its claims by clear and convincing evidence. (Doc. 61 at 9 (citing *Bradshaw*, 758 P.2d at 1320).) *Bradshaw* does not require clear and convincing evidence to prove the elements of wrongful institution of civil proceedings, although it does note that the higher standard is required for punitive damages. 758 P.2d at 1320. Horton cites no authority requiring clear and convincing evidence to establish abuse of process.

suit; liability reaches anyone who "takes an active part in the initiation, *continuation* or procurement of civil proceedings against another." Restatement (Second) of Torts § 674 (1977) (emphasis added); *see McClinton v. Rice*, 265 P.2d 425, 431 (Ariz. 1953) (holding that institution of an action "is, of course, fundamental to [a wrongful institution claim]" but that it is also "necessary" that the "accuser was instrumental in its institution or continuation").

There is no dispute between the parties that Horton instituted a civil action when he filed the *Underlying Action*. (Doc. 65 at ¶¶ 33–34; Doc. 74-1 at ¶ 1.) I therefore turn to the remaining four elements.

**1. Probable Cause**

Because the absence of probable cause supports an inference of malice, *McClinton*, 265 P.2d at 430–31, I address probable cause first. Probable cause has both a subjective and an objective component. "The initiator of the action must honestly believe in its possible merits; and, in light of the facts, that belief must be objectively reasonable." *Bradshaw*, 758 P.2d at 1319. The question is whether the initiator "reasonably believes that he has a good chance of establishing [his case] to the satisfaction of the court or the jury." *Id.*; *see McClinton*, 265 P.2d at 431 ("The test generally applied is: upon the appearances presented to the defendant, would a reasonably prudent man have instituted or continued the proceeding?").

Courts decide the objective question first. *Chalpin v. Snyder*, 207 P.3d 666, 672 (Ariz. Ct. App. 2008). Both components are required, so a claim that is not objectively reasonable lacks probable cause regardless of what the initiator subjectively believed. *See Bradshaw*, 758 P.2d at 1319. When the material facts are undisputed, whether they establish probable cause is a question for the court. *Id.*; Restatement (Second) of Torts § 681B(1)(c).

In the *Underlying Action*, Horton asserted two types of claims: (a) telemarketing claims arising from the Calls under the TCPA and Texas Code section 305.053 (collectively, the "Telemarketing Claims"), and (b) a refund claim under Texas Code

section 301.052. (*See* Doc. 65 at 8–9.) Horton lacked probable cause to bring, and continue to prosecute, either claim.

a. Telemarketing Claims

To the extent Horton brought the *Underlying Action* based on the theory that Pivot itself placed the Calls, he clearly lacked probable cause.[10] As of October 13, 2022, two months before Horton filed the *Underlying Action*, Horton knew that Pivot had not placed the Calls. (Doc. 65 at 333 (American Health explaining to Horton that Rank Media made the Calls).) Indeed, on October 17, 2022, Horton told Pivot that it was Rank Media "who actually called [him]," and Rank Media who Horton "really wanted to sue." (Doc. 65 at 428.) Thus, any suit predicated on Pivot making the Calls lacked both objective and subjective components necessary to establish probable cause. Horton concedes this point, insisting that he "ALWAYS knew that Pivot did not PHYSICALLY make the calls." (Doc. 65 at ¶ 37; Doc. 74-1 at 7–8.)

Horton contends that he had probable cause to bring the Telemarketing Claims under a theory of vicarious liability. (Doc. 61 at 5; Doc. 74 at 6, 9–11.) A seller may be held vicariously liable under the TCPA for a third party's calls only if the plaintiff establishes an agency relationship between the seller and the caller under federal common-law agency principles. *Jones v. Royal Admin. Servs., Inc.*, 887 F.3d 443, 449–50 (9th Cir. 2018). Horton asserts that he had probable cause to believe an agency relationship existed between Pivot and the caller because immediately after he bought the Policy, he received welcome emails from Pivot and Pivot charged him for the Policy. (Doc. 77 at ¶ 6; Doc. 71 at ¶ 6; *see also* Doc. 65 at ¶ 4; Doc. 74-1 at ¶ 1.)

As of October 10, 2022—the day Horton purchased the Policy and received the Pivot-branded materials—Horton had reason to believe that Pivot was responsible for the

---

[10] Horton now disavows that he ever claimed that Pivot placed the Calls. (Doc. 74 at 3–5; Doc. 71 at ¶ 6.) However, his amendments to his complaint in the *Underlying Action*—which, in substance, changed many of his allegations from, "Pivot's agent made the Calls" to "Pivot made the Calls"—indicate that he sought relief on a theory of direct as well as vicarious liability. *See Underlying Action*, Doc. 13 at ¶¶ 13, 30–34.

Calls. But Horton did not file the *Underlying Action* on October 10, 2022. He filed it two months later, on December 29, 2022. By then, no reasonably prudent person would have believed that Horton had viable Telemarketing Claims against Pivot for the Calls for several reasons. First, American Health told Horton that Rank Media made the Calls and that, after receiving a "live transfer" from Rank Media, an American Health agent sold Horton the Policy. Second, Pivot repeatedly explained to Horton that it had neither made the Calls, nor directed any third party to do so. Third, Rank Media never denied making the Calls and expressed that it was unaware of any relationship between Pivot and the Calls. Fourth, and most critically, on December 20, 2022, nine days before he filed suit, Horton agreed to settle all claims arising from the Calls—including those against Pivot—for $18,000. The day after he filed suit, Horton signed the Rank Media Release finalizing the settlement of all claims arising from the Calls against Rank Media and "any other party whatsoever." (Doc. 65 at ¶ 26; Doc. 74-1 at ¶ 26.)

Horton presents very little to rebut this evidence and create a dispute of material fact. He maintains that because the Policy was a Pivot product, Pivot must have been involved in the Calls. But Horton's speculation is insufficient to create a genuine issue of material fact as to whether he reasonably believed Pivot was vicariously liable for the Calls. That a company's products are sold by a third party does not make the third party its agent. Horton is well aware of this principle; his arguments to the contrary have been rejected in at least one of his prior TCPA suits. *See Horton v. SunPath*, 2021 WL 982344, at *4 (N.D. Tex. Feb. 16, 2021) (holding that Horton's "conclusory allegation" that the defendant "acted in an agency relationship with [third-party] telemarketing companies" based solely on the fact that Horton purchased the defendant's product "does not suffice to impute [the telemarketer's] actions to Defendant under an agency theory"). And, as described above, while his belief that Pivot was associated with the Calls may have been reasonable when Horton first purchased the Policy, it was objectively untenable by the time he brought the *Underlying Action*.

The one piece of evidence Horton attempts to rebut is the Rank Media Release. He

first argues that the Release did not bar his claims against Pivot because it does not mention Pivot by name.[11] (Doc. 74 at 3, 5–6, 10; Doc. 77 at ¶ 4.) This argument fails. To begin, the Release, by its plain terms, released all claims arising from the Calls against Rank Media and "any other party whatsoever." (Doc. 65 at ¶ 26; Doc. 74-1 at ¶ 26.) No reasonably prudent person could have interpreted such unequivocal language to mean its opposite—that is, that "any other party whatsoever" actually meant "only those parties explicitly named." Moreover, any ambiguity in the Release is resolved by Horton's emails with Maxvill, Rank Media's attorney. Those emails make clear that Rank Media would not settle unless Horton agreed to release all claims against all parties, including Pivot. (*See* Doc. 65 at 471 (Maxvill tells Horton that excluding Pivot was "a deal breaker" and that "[a]ll of your claims against any party related to phone calls in your complaint must be released.").) Initially, this was a sticking point for Horton, but not for long. On December 20, 2022, he told Maxvill to "[g]o ahead and send the agreement for 18k," explaining that he had "found another law pivot [sic] broke by not giving [him] a refund that is 10k a pop" and would "get them that way." (Doc. 65 at 470.) Horton then signed the agreement releasing all claims against "any other party whatsoever" arising from the Calls. Faced with these facts, no reasonable person could conclude that the Rank Media Release did not cover Horton's Telemarketing Claims against Pivot. Horton therefore lacked probable cause.

Having found that Horton lacked objective probable cause, I need not address whether Horton subjectively believed he had probable cause to assert the Telemarketing Claims. *See Bradshaw*, 758 P.2d at 1319. Even so, Horton could not pass the subjective part of the probable cause test. *See id.* at 1320. Horton concedes that he agreed to include

---

[11] Horton also asserts that this belief was reasonable because his claims were worth more than $18,000. (Doc. 74 at 9–10.) But that Horton thought he could have gotten more than $18,000, *if he had not settled*, does not support a reasonable belief that, after settlement, he could continue to seek relief for claims he had released against "any other party whatsoever."

Pivot in the Rank Media Release, (*see* Doc. 74 at 6), and the emails show that he did so on December 20, 2022. He nonetheless asserts that when he signed the written Release and saw that it did not expressly name Pivot, he assumed that Rank Media had dropped its "deal breaker" provision, and that he was free to sue Pivot for telemarketing violations. (*Id.* at 5–6.) Horton's own account of events refutes this claimed belief. Horton admits that he did not see the written Release until *after* he filed the *Underlying Action*. (*Id.* at 5.) His asserted belief that the Release excluded Pivot therefore could not have been the basis for filing suit. When Horton filed suit on December 29, 2022, he knew only what he had agreed to nine days earlier: a release of all claims arising from the Calls, including those against Pivot. (Doc. 65 at 470–71.)

Furthermore, the record demonstrates that Horton subjectively knew the Rank Media Settlement disposed of his Telemarketing Claims against Pivot. Again, Horton agreed to release his claims against Pivot on December 20. Eight days later, on December 28, Horton told Pivot that the settlement with Rank Media "fell through." (Doc. 65 at ¶ 29; *id*. at 416; Doc. 74-1 at ¶ 29.) Horton now explains that when he said the agreement "fell through," he was referring to his refusal to include Pivot in the Release. (Doc. 74 at ¶ 29 ("At the time, Horton thought it had fallen through because they wanted to include Pivot without raising the settlement. He later changed his mind to agree to their terms.") But that dispute ended when Horton accepted Rank Media's terms on December 20, eight days *before* he told Pivot the agreement fell through—and thus, could not have been the grounds for Horton's statement to Pivot. (Doc. 65 at 419, 470.) Horton offers no other explanation for his statement that the settlement "fell through," and the record reveals none. Horton sued Pivot the next day and signed the Rank Media Release the day after that. (Doc. 65 at ¶¶ 26, 29; Doc. 74-1 at ¶¶ 26, 29.) Horton never told Pivot that he had settled with Rank Media. (*See* Doc. 65 at ¶ 32; Doc. 74-1 at ¶ 32.) And he deleted his correspondence with Rank Media and American Health shortly afterward. (Doc. 65 at ¶ 30; Doc. 74-1 at ¶ 30.) Horton's false statement that the settlement "fell through" and his subsequent concealment of that settlement are inconsistent with an honest belief that his claims had

merit. *See Bradshaw*, 758 P.2d at 1319.

Finally, even if Horton had some objectively-reasonable belief in his Telemarketing Claims when he filed suit against Pivot, he certainly had no such belief when he continued to litigate the case by amending his complaint to allege that Pivot itself made the Calls. On March 2, 2023, two months after he signed the Rank Media Release, Horton filed an amended complaint alleging that Pivot "places unwanted telemarketing calls to solicit consumers to purchase health insurance policies" and that Pivot "made the calls." *Underlying Action*, Doc. 13 at ¶¶ 13, 30–34. (Doc. 65 at ¶ 36; Doc. 74-1 at ¶ 36.) Horton knew those allegations were false. He later testified that he "knew pivot [sic] didn't . . . pick up the phone and dial my number," and he insists that he "ALWAYS knew that Pivot did not PHYSICALLY make the calls." (Doc. 65 at ¶ 37; Doc. 74-1 at ¶ 37.) Horton's explanations that the allegations were a "typo" or that Pivot read them "too literally" ring hollow. (*Id.*) In the amended complaint, Horton alleged in plain terms that Pivot made the Calls. He filed the amended complaint in response to a motion to dismiss arguing that Horton had not alleged that Pivot made the Calls, *Underlying Action*, Doc. 9, and the magistrate judge relied on the amended allegations in recommending that the case proceed to discovery. (Doc. 65 at ¶ 38; Doc. 74-1 at ¶ 38.) A litigant who asserts allegations he knows to be false, simply to survive dismissal, does not have probable cause to continue the action. *See Bradshaw*, 758 P.2d at 1319; Restatement (Second) of Torts §§ 674, 675.

b. Refund Claim

Horton also lacked probable cause for his refund claim under Texas Code section 301.052. That provision reaches only sellers who act "through the use of a telephone solicitor." Tex. Bus. & Com. Code § 301.052. The claim therefore suffered from the same defect as the Telemarketing Claims: Horton had no reasonable basis to believe that Pivot used Rank Media, or any other telephone solicitor, to sell him the Policy. (*See* Doc. 64 at 16 n.4.)

The refund claim also required Horton to have requested a refund within seven days of receiving the Policy. Tex. Bus. & Com. Code § 301.052(1)(A). Horton's original

complaint alleged that he requested a refund on October 23, 2022, thirteen days after he purchased the Policy, and that he made the request to Pivot's outside litigation counsel. *Underlying Action*, Doc. 3 at ¶¶ 13–14; *see* Doc. 65 at 426. Nothing in Horton's correspondence before he initiated the *Underlying Action* suggests he believed he had made an earlier refund request. When Pivot's counsel told Horton in December 2022 that Pivot had no record of any refund or cancellation request, and asked him to identify whom he had notified and to provide a copy of the notice, Horton responded that he did "not give a shit about requesting the refund correctly," because "I requested it and that douchebag [referring to Kaminsky, Pivot's outside counsel] should have issued it." (Doc. 65 at 417–19.) Only after Pivot moved to dismiss did Horton amend to allege that he requested a refund "the day after" his purchase. *Underlying Action*, Docs. 9, 13. And only after Pivot served discovery seeking evidence of that refund request did the 2022 Refund Demand, dated October 13, 2022, surface. (Doc. 65 at ¶¶ 40–46.) As explained below, there is no genuine dispute that the 2022 Refund Demand was fabricated. *See infra* Section II(E)(1). Horton therefore had no objectively reasonable basis to believe he made a timely refund request, and his own conduct shows that he also lacked a subjective belief that he timely requested a refund.

There is no genuine dispute that Horton lacked probable cause to institute or continue litigating any of the claims he asserted in the *Underlying Action*.

**2. Malice**

Malice "does not require proof of intent to injure." *Bradshaw*, 758 P.2d at 1320. Instead, Pivot must show that Horton "primarily used the action for a purpose other than that of securing the proper adjudication of the claim." *Id.* (citing Restatement (Second) of Torts § 676). A lack of probable cause can support an inference of malice. *McClinton*, 265 P.2d at 430–31. The Restatement identifies two recurring situations in which the purpose is improper: (1) the initiator "is aware that his claim is not meritorious"; and (2) the proceedings are brought "for the purpose of forcing a settlement that has no relation to the merits of the claim," such as a "nuisance suit" filed to make the defendant pay "to avoid

the financial and other burdens that a defense against it would put upon him." Restatement (Second) of Torts § 676 cmt. c.

The absence of probable cause here supports an inference of malice, and the uncontroverted record reinforces it. Horton knew that Pivot did not make the Calls, and he had agreed to release his claims arising from them as to "any party," yet he sued Pivot anyway. He told Rank Media's counsel he would "get [Pivot]" (Doc. 65 at 470), and he testified that he "was going to sue [Pivot] no matter what." (*Id.* at 243.) Horton then told Pivot his settlement with Rank Media "fell through," when in fact it had not, and proceeded to settle all claims arising from the Calls the day *after* he filed suit against Pivot. No reasonable juror, presented with this evidence, could conclude that Horton acted without malice.

Horton responds that he believed his claims were meritorious and that he sued only to stop unlawful robocalls.[12] (Doc. 61 at 5; Doc. 74 at 3, 12.) But a bare assertion of good faith, contradicted by Horton's own contemporaneous statements and conduct, does not create a genuine dispute of material fact. *See FTC v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact."). There is no genuine dispute that Horton acted with malice.

### 3. Termination in Pivot's Favor

"When a termination or dismissal indicates in some fashion that the accused is innocent of wrongdoing it is a favorable termination." *Frey v. Stoneman*, 722 P.2d 274, 278 (Ariz. 1986). While voluntary withdrawal can amount to "a confession that the case was without merit," it does not always qualify. *Id.*; *Lane v. Terry H. Pillinger, P.C.*, 939 P.2d 430, 432–33 (Ariz. Ct. App. 1997). When there has been no adjudication on the merits, the question "must be found in the substance rather than the form of prior events." *Frey*, 722 P.2d at 279. The question is whether the dismissal reflects "the opinion of the

---

[12] Horton also argues that probable cause is a complete defense. (Doc. 61 at 5.) Because he lacked probable cause, any such defense is unavailable to him.

dismissing party that the action was meritless." *Lane*, 939 P.2d at 433.

The undisputed facts show that Horton dismissed the *Underlying Action* because his claims lacked merit. Horton dismissed the case shortly after Pivot threatened to subpoena Yahoo to obtain records—or lack thereof—regarding the authenticity of the 2022 Refund Demand. Immediately prior to the dismissal, Horton stated that an agency relationship would be difficult to prove and that he was therefore "considering dropping" his suit against Pivot. (Doc. 65 at ¶ 52; *see* Doc. 74-1 at ¶ 52.) He then moved to voluntarily dismiss the case.

Horton identifies no procedural or technical reason for the dismissal, instead contending that he dismissed the case because Pivot "lied in discovery" about its relationship with American Health and Rank Media, and that the termination was therefore "BECAUSE of Pivot's wrongdoing." (Doc. 74 at 6, 13.) But Horton offers no evidence that Pivot lied about anything during discovery. (*See* Doc. 65 at 411–12 (Pivot's declaration in the *Underlying Action* stating that it did not have any authority over the Calls).) His assertion rests on nothing but his own conviction that an agency relationship must have existed, which is not enough to create a genuine dispute. *See Publ'g Clearing House*, 104 F.3d at 1171. Horton's own account of why he dismissed the case confirms the point: he "knew that without agency, Pivot would prevail" and "felt [he] had no way to continue the lawsuit with any hope of winning." (Doc. 74 at 13; Doc. 77 at 6.)

Dismissing a case because one cannot prove an essential element of the claim is a termination on the merits in substance. *See Frey*, 722 P.2d at 279. I therefore find no genuine dispute that the *Underlying Action* terminated in Pivot's favor.

**4. Damages**

A plaintiff who proves wrongful institution of civil proceedings may recover, among other things, "the expense that he has reasonably incurred in defending himself against the proceedings." Restatement (Second) of Torts § 681(c) (1977). It is undisputed that Pivot incurred more than $140,000 in attorneys' fees defending the *Underlying Action*. (Doc. 65 at 11; Doc. 74-1 at 10.)

Horton's arguments to the contrary miss the mark. He argues that Pivot cannot recover its fees from the *Underlying Action* because the TCPA is not a fee-shifting statute, the American Rule requires each party to bear its own fees, and fees were not available to Pivot in the *Underlying Action*. (Doc. 74 at 6, 13–14; Doc. 77 at 2–3 (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975), and *F.D. Rich Co. v. Indus. Lumber Co.*, 417 U.S. 116, 129 (1974)).) This argument conflates the damages Pivot seeks in the present case with the fees available to Pivot in the *Underlying Action*. Pivot does not ask to shift fees under the TCPA or any other statute. It seeks compensatory damages for a tort, and the defense costs Pivot incurred because of that tort are the measure of its injury. Restatement (Second) of Torts § 681(c); *cf. Coker Equip. Co. v. Wittig*, 366 F. App'x 729, 733 (9th Cir. 2010) (recognizing that attorneys' fees and costs "can constitute compensatory damages" for abuse of process). The American Rule governs who pays the fees of the litigation at hand; it does not prevent a tort plaintiff from recovering, as damages, fees it was forced to spend in a prior proceeding that was wrongfully instituted and maintained. And Pivot's decision not to seek sanctions in the *Underlying Action* does not prevent it from pursuing an independent tort claim. Horton cites no authority suggesting otherwise, and I am not aware of any. Pivot has therefore established that it was damaged.[13]

Because there is no genuine dispute of material fact on any element, Pivot is entitled to summary judgment for its wrongful-institution claim.

**E. Abuse of Process**

To establish abuse of process, a plaintiff must show "(1) a willful act in the use of judicial process; (2) for an ulterior purpose not proper in the regular conduct of the proceedings." *Nienstedt v. Wetzel*, 651 P.2d 876, 881 (Ariz. Ct. App. 1982). "A party can demonstrate the latter element by showing that the process has been used primarily to

---

[13] Horton separately contends that Pivot's fees are unreasonable. (Doc. 77 at 3–4.) The amount of Pivot's recoverable damages, including the reasonableness of the fees claimed and Pivot's request for punitive damages, is not before the Court on this motion and will be determined separately.

accomplish a purpose for which the process was not designed." *Crackel v. Allstate Ins. Co.*, 92 P.3d 882, 887 (Ariz. Ct. App. 2004). And while there is no liability when a defendant with bad intentions "legitimately utilize[s] the process for its authorized purposes," liability will attach when the process is "properly obtained or issued" but is "subsequent[ly] misuse[d]." *Nienstedt*, 651 P.2d at 881. A plaintiff must therefore show that "in using the court process, the defendant took an action that could not logically be explained without reference to the defendant's improper motives." *Crackel*, 92 P.3d at 889. A plaintiff must also establish that it was harmed by the defendant's abuse of process. *Nienstedt*, 651 P.2d at 881.

Pivot contends that Horton abused process by fabricating the 2022 Refund Demand and producing it in discovery in the *Underlying Action*. (Doc. 64 at 19–22.) Discovery is a "process" for these purposes. *Nienstedt*, 651 P.2d at 880–81; *Crackel*, 92 P.3d at 888 (recognizing that "behavior in responding to discovery requests or misrepresentations made to opposing counsel and the court" may constitute abuse of process). I first address the factual question of fabrication and then turn to the elements of Pivot's abuse of process claim.

**1. The 2022 Refund Demand Was Fabricated**

Pivot asserts that Horton fabricated the 2022 Refund Demand. (Doc. 64 at 19–21; Doc. 79 at 4–6.) Horton denies that he did so. (Doc. 61 at 11–12; Doc. 74 at 13–14; Doc. 74-1 at ¶¶ 42–49.) The record establishes the following:

At 9:15 a.m. Eastern Standard Time on February 13, 2024, Pivot served discovery requests on Horton seeking evidence for his allegation that he "requested a refund the day after purchasing the policy." (Doc. 65 at ¶ 40; Doc. 74-1 at ¶ 40.) About two hours later, at 11:29 a.m. Eastern (10:29 a.m. Central), Horton emailed memberservices@pivothealth.com: "Please refund this." (Doc. 65 at ¶ 42; *id.* at 432, 446.)

On March 18, 2024, Horton produced a PDF of the 2022 Refund Demand. The 2022 Refund Demand bears the same clock time, 10:29 a.m., and the same opening text, "Please refund this," as Horton's February 2024 email. (Doc. 65 at ¶¶ 43–44; *compare id.*

at 355, *with id.* at 446.) According to its metadata, the PDF of the 2022 Refund Demand was created at 11:36 a.m. on February 13, 2024. That is seven minutes after Horton sent the February 2024 email, and the same morning Pivot asked for proof of a timely refund request. (Doc. 65 at ¶ 45; *id.* at 338.)

Pivot's member services account has no record of receiving any email from Horton on October 13, 2022. (Doc. 65 at ¶ 47; *id.* at 432–33.) It did, however, receive the February 2024 email. (*Id.*; *see id.* at 446.) Prior to his production of the 2022 Refund Demand, Horton had never mentioned an October 13 refund request. His original complaint alleged that he first requested a refund on October 23, 2022, from David Kaminsky, Pivot's counsel. *Underlying Action*, Doc. 3 at ¶¶ 13–14. This is consistent with the record evidence, which shows that on October 23, 2022, Horton requested a refund from Kaminsky. (Doc. 65 at 426.) When Pivot's counsel told Horton in December 2022 that Pivot had no record of any refund request and asked for a copy of whatever notice he had sent, Horton produced nothing. (Doc. 65 at 417–19.) Instead, he responded that he did "not give a shit about requesting the refund correctly," and further added that "I requested it and that douchebag [Kaminsky] should have issued it." (*Id.* at 417–18.) Even Horton's amended complaint, which deleted the reference to the October 23, 2022 request, alleged that he requested a refund "the day after" his October 10 purchase, not on October 13. (Doc. 65 at ¶ 40.) Finally, Horton moved to dismiss the *Underlying Action* days after Pivot told him it would subpoena Yahoo for his email records. (Doc. 65 at ¶¶ 51–53; Doc. 74-1 at ¶¶ 50–53.) He then deleted all email records related to the 2022 Refund Demand. (Doc. 65 at ¶ 58; Doc. 74-1 at ¶ 58.)

Horton offers no rebuttal to this evidence. Horton does not explain why he requested a refund from Pivot in February 2024—over a year after he filed suit over the same refund. He does not explain why the PDF for the 2022 Refund Demand was created seven minutes after he sent the February 2024 email. He does not explain why the time stamp matches the 2024 email, or why both emails include the same language: "Please refund this." He does not offer any explanation or evidence for why Pivot has no record

of the 2022 email, but did receive the 2024 email. Nor does he explain his inconsistent positions in the *Underlying Action*—first that he submitted a refund on October 23, 2022, then that he submitted a refund on October 11, 2022, and then that the email he produced showed a date of October 13, 2022.

The only evidence that Horton does attempt to rebut is Pivot's observation that the 2022 Refund Demand is stamped "October 13, 2022 at 10:29 AM CST," even though October 13, 2022, fell during daylight saving time, and therefore should have been stamped "CDT." (Doc. 65 at ¶ 49; *id*. at 355.) Horton contends that his VPN, his Yahoo language settings, or his failure to set a calendar time zone could have caused the "CST" label. (Doc. 74 at 13.) Pivot disagrees and presents evidence rebutting Horton's assertions. (Doc. 65 at ¶ 61; *id*. at 339–40, 372–76; Doc. 79 at 5.) Regardless, even crediting Horton's explanation for the incorrect time zone, Horton offers no rebuttal to the remainder of Pivot's overwhelming evidence that Horton fabricated the 2022 Refund Demand. On this record, no reasonable jury could find that the 2022 Refund Demand is authentic. There is no genuine dispute that Horton fabricated it.

**2. Use of Process and Improper Purpose**

Responding to discovery requests is a use of legal process. *See Nienstedt*, 651 P.2d at 880–81; *Crackel*, 92 P.3d at 888. It is undisputed that Horton chose to produce the 2022 Refund Demand. The first element, "a willful act in the use of judicial process," is therefore satisfied. *Nienstedt*, 651 P.2d at 881.

The second element, "improper purpose," is also satisfied. Discovery exists so that parties can obtain genuine evidence bearing on their claims and defenses. It is not designed to manufacture evidence. Fabricating evidence in discovery is not a legitimate use of process carried out "with bad intentions," nor is it a proper use accompanied by "an incidental motive of spite." *Id.* Rather, it is an act that cannot "logically be explained without reference to the defendant's improper motives." *Crackel*, 92 P.3d at 889. The only logical explanation for Horton's fabrication of the 2022 Refund Demand is that Horton lacked evidence of a timely refund request, a necessary element of his refund claim,

and so he fabricated a timely request to give the claim support it otherwise lacked so he could pressure Pivot to settle a meritless claim.

Horton contends that the 2022 Refund Demand was only one of six refund requests and a "minute and minor part" of the *Underlying Action*. (Doc. 78 at 5; see Doc. 71 at ¶ 17.) But the 2022 Refund Demand was the only request that purported to fall within the seven-day window provided by Texas Code section 301.052. (Doc. 71 at ¶ 17; Doc. 65 at 420–26.) The fabricated document was thus the only evidence that could have saved his refund claim. There is no genuine dispute that Horton used a judicial process for an improper purpose.

**3. Harm**

Damages for abuse of process include the expenses the plaintiff incurred in responding to the misuse. *See Liberti v. City of Scottsdale*, 560 P.3d 322, 329 (Ariz. Ct. App. 2024); *Coker Equip. Co.*, 366 F. App'x at 733 ("[A]ttorney fees and costs can constitute compensatory damages for abuse of process."). Horton's fabrication of the 2022 Refund Demand forced Pivot to investigate its authenticity during the *Underlying Action*. Horton does not seriously dispute that Pivot was harmed by his production of the 2022 Refund Demand, though he challenges the amount of harm.[14] (*See, e.g.*, Doc. 61 at 12; Doc. 74 at 14; Doc. 78 at 5 (arguing that Pivot could have investigated more efficiently and cannot recover all of its defense costs based on one document).) There is thus no genuine dispute that Pivot was harmed by Horton's fabrication of evidence in the *Underlying Action*.

Because there is no genuine dispute of material fact on any element, Pivot is entitled to summary judgment on liability for its abuse of process claim.

**F. Damages**

Pivot has established liability on both claims. Its damages, however, will be determined at trial, and I will set a trial setting conference accordingly. Horton has raised

---

[14] Pivot may recover only the harm caused by the abuse of process, and the amount of that harm, like Pivot's other damages, will be determined separately.

several challenges to Pivot's damages, including that Pivot's fees are unreasonable and that Pivot did not properly disclose its damages under Federal Rule of Civil Procedure 26(a)(1)(A)(iii). (*See* Doc. 61 at 10–11.) Horton may raise those arguments, and any others bearing on the amount of damages, in the context of trial.

## III. CONTEMPT OF COURT

In addition to its motion for summary judgment, Pivot asks me to hold Horton in civil contempt for his conduct at his September 24, 2025 deposition. Pivot requests that I sanction Horton and direct him to pay "[a]t the very least," Pivot's attorneys' fees "connected with the deposition and preparing this motion."[15] (Doc. 64 at 22–23.)

### A. Legal Standard

"Civil contempt consists of a party's disobedience to a specific and definite court order by failure to take all reasonable steps within the party's power to comply." *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 945 (9th Cir. 2014) (citation modified) (quoting *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 10 F.3d 693, 695 (9th Cir. 1993)). "A district court has the inherent authority to enforce compliance with its orders through a civil contempt proceeding, a wide latitude in determining whether there has been a contemptuous violation of its order, and broad equitable power to order appropriate relief." *Toyo Tire & Rubber Co. v. Hong Kong Tri-Ace Tire Co.*, 281 F. Supp. 3d 967, 984 (C.D. Cal. 2017) (citation modified). "In a civil contempt action, '[t]he moving party has the burden of showing by clear and convincing evidence that the contemnors violated a specific and definite order of the court. The burden then shifts to the contemnors to demonstrate why they were unable to comply.'" *FTC v. Enforma Nat. Prods., Inc.*, 362 F.3d 1204, 1211 (9th Cir. 2004) (alteration in original) (quoting *Stone v. City & County of San Francisco*, 968 F.2d 850, 856 n.9 (9th Cir. 1992)).

"Inability to comply with an order is a complete defense to a charge of contempt."

---

[15] Pivot also asks that I refer this matter to the United States Attorney. (Doc. 64 at 5, 24; Doc. 79 at 11.) I defer resolution of this request.

*Coleman v. Newsom*, 131 F.4th 948, 959 (9th Cir. 2025) (citation modified). "If the record establishes that there in fact is a present inability to comply with an order, the civil contempt inquiry is at an end." *Id.* at 960. Inability requires more than establishing that "compliance would be difficult or expensive"; instead, contemnors must prove that "compliance was 'factually impossible.'" *Id.* (quoting *United States v. Rylander*, 460 U.S. 752, 757 (1983)).

**B. The August 22 Order and Horton's Deposition**

The relationship between the parties has been contentious from the outset of this litigation. (*See, e.g.*, Doc. 53 at 3:7–20.) On January 20, 2025, Pivot moved for sanctions against Horton. (Doc. 25.) Pivot sought an order directing the parties to treat each other civilly, because it had repeatedly received unprofessional and abusive communications from Horton.[16] (*Id.* at 5–6.) At a hearing held on August 21, 2025, Horton consented to an order requiring civility from the parties and indicated that he was willing to comply with any such prescription. (Doc. 53 at 5:7–24.) I granted the motion and, on August 22, 2025, ordered the parties to "treat each other civilly in their interactions during this litigation." (Doc. 49 at 3.)

One month later, on September 24, 2025, Pivot deposed Horton. (Doc. 65 at 186.) Before Pivot's attorney, Patrick Fitzgerald, even began questioning Horton, Horton expressed that the deposition was a "waste of time," told Fitzgerald that he was "going way too slowly" and that Horton did not want Fitzgerald "taking five minutes to read two sentences off [a] stupid piece of paper." (Doc. 65 at 191–92.) When Fitzgerald informed Horton that he had seven hours to depose Horton, Horton said "I'm not staying here for seven hours so you can fuck off if you think I'm doing that." (*Id.* at 192.)

As Fitzgerald continued his questioning, Mr. Horton's conduct did not improve. (*See, e.g.*, *id.* at 193 (Fitzgerald: "You said you needed reading glasses. Do you have those

[16] Pivot's motion for sanctions also requested relief based on Horton's alleged misrepresentations to the Court about the 2022 Refund Demand. (Doc. 25.) Because that issue was duplicative of the claims underlying this dispute, I declined to address it. (Doc. 49.)

glasses with you today?" Horton: "You can see them right there. Don't ask a question you know the answer to . . . What the fuck do you think this is, dude?"); *id.* at 201–202 (Fitzgerald: "Mr. Horton, I will take this deposition at my pace." Horton: "Yeah. And I'll leave when I feel like it . . . Who's going to stop me? These two. Yeah; right. You're a clown man. Just go."). Over the course of the deposition, Horton called Fitzgerald a "fucking clown," "fucking idiot," and "motherfucker," and also made remarks to Fitzgerald such as "God, you're an idiot," "God, you're a douche bag," "You're a clown man," "Tell these fucking assholes to stop being jerks," and "God, you're a clown." (*Id.* at ¶ 63; Doc. 74-1 at ¶ 63.) Horton does not dispute his statements made during the deposition. He asserts that he "made every attempt to treat Fitzgerald with respect at the deposition" but that, "without an attorney, Horton was not able to control his temper when repeatedly goaded by Fitzgerald." (Doc. 74-1 at ¶ 63.)

At one point, "Horton was physically combative." (Doc. 65 at ¶ 65.) Pivot asserts that he "threw exhibits, slammed the table, and repeatedly screamed at Pivot['s] counsel." (*Id.*) The "neutral location staff . . . threatened to kick [Horton] out and end the deposition." (Doc. 65 at ¶ 65; Doc. 74-1 at ¶ 65; *see also* Doc. 65 at 223.) Horton states that he "never threw anything," but otherwise does not dispute that he was physically combative. (Doc. 74-1 at ¶ 65.) Horton explains that he was upset because Fitzgerald was harassing him, and that he "apologized to everyone but Fitzgerald afterwards." (Doc. 74-1 at ¶ 65.)

### C. Horton's Conduct Violated the August 2022 Order

Horton's conduct at his deposition clearly violated my order directing the parties to "treat each other civilly in their interactions during this litigation." (Doc. 49 at 3.) No reasonable interpretation of an order to "treat each other civilly" would permit Horton's obscene and abusive behavior. Pivot has shown by clear and convincing evidence that Horton violated the August 2022 Order and I will find Horton in civil contempt.

To avoid this result, Horton invokes a defense of impossibility. He argues that he was unable to comply with my order because he suffers from anger, mood, and anxiety issues that made it "impossible" for him to control his temper. (Doc. 74 at 1, 7, 15.)

As an initial matter, Horton cites no case, and I am aware of none, that applies the impossibility defense to something so wholly within the contemnor's control as their own behavior. *See, e.g., Coleman*, 131 F.4th at 960 (holding that the district court did not abuse its discretion when it rejected the state's impossibility defense based on a nationwide staffing shortage because the state "failed to . . . rebut clearly meaningful pathways that could potentially bring it into compliance"); *Rylander*, 460 U.S. 752 (holding that the impossibility defense could be used when a subpoena requires the production of documents no longer in the contemnor's possession or control); *Falstaff Brewing Corp. v Miller Brewing Corp.*, 702 F.2d 770, 781 (9th Cir. 1983) (holding that a court may not find a litigant in contempt when they do not possess the documents they were ordered to produce).

Even assuming the impossibility defense could apply to Horton's management of his own temper, his argument fails. The record demonstrates that Horton can control his temper when he wants to. (Doc. 74 at 7, 15–16 (Horton's response stating that after the order issued, he stopped his email attacks, and that he was "duly respectful" at the in-person hearing); Doc. 53 at 5:7–24 (Horton affirming that he would comply with an order directing him to be civil).) Beyond conclusory statements that Horton has anger issues and anxiety, Horton has not produced any evidence that treating Pivot's counsel civilly was "factually impossible." *Rylander*, 460 U.S. 752.

Horton's remaining arguments are unavailing. Horton blames Pivot's counsel for his outbursts, contending that Fitzgerald "goaded" and "harassed" him with repetitive and irrelevant questions, and that the deposition was unnecessary. (Doc. 74 at 1–2, 7, 14–16.) I have reviewed the deposition transcript, and I find that Fitzgerald's questions were well within the bounds of appropriate conduct. Regardless, even if Horton considered Fitzgerald's questions to be repetitive, irrelevant, or intrusive, that did not grant him license to berate Fitzgerald with abusive language. If Horton believed the questioning was improper, the Federal Rules provided remedies: he could object, or he could suspend the deposition to seek a protective order. Fed. R. Civ. P. 30(c)(2), (d)(3).

Finally, Horton argues that his conduct was directed at Pivot's counsel, not at me,

and so shows no contempt for my authority. (Doc. 74 at 14–16.) Horton misunderstands civil contempt. The question is whether Horton disobeyed my order, not whether he intended to disrespect me personally. *See Dual-Deck*, 10 F.3d at 695. The order required Horton to treat Pivot's counsel civilly. His disrespect toward Pivot's counsel is the violation.

I therefore find Horton in civil contempt of the August 22, 2025 Order.

**D. Appropriate Sanction**

Pivot is entitled to a compensatory award of the reasonable attorneys' fees and costs it incurred because of Horton's violation.[17] *Inst. of Cetacean Rsch.*, 774 F.3d at 958–59. Within fourteen days of this Order, Pivot shall file a declaration, with supporting billing records, itemizing its fees and costs. Horton may file a response to Pivot's declaration within fourteen days after it is filed, in which he may contest the reasonableness of the fee request.

## IV. CONCLUSION

Horton sued Pivot over calls he knew Pivot did not make, and then continued that suit after agreeing to release all claims arising from the Calls against any party whatsoever. He then fabricated evidence to keep his meritless refund claim alive. The undisputed record shows that he did so without probable cause and for an improper purpose, and that the *Underlying Action* ended in Pivot's favor only after Pivot had spent considerable resources defending it. Pivot is therefore entitled to summary judgment on liability for both wrongful institution of civil proceedings and abuse of process. And because Horton disregarded my order to conduct this litigation civilly, I hold him in civil contempt and will award Pivot the fees and costs caused by his violation by separate order.

Accordingly,

**IT IS ORDERED** denying Defendant's Amended Motion for Summary Judgment

---

[17] Horton had notice and an opportunity to respond to Pivot's motion for sanctions. (*See* Doc. 74 at 1–2 (Horton addressing Pivot's motion for sanctions).) Because the facts are uncontroverted, no evidentiary hearing or other process is necessary before imposing civil sanctions. *United States v. Ayres*, 166 F.3d 991, 995 (9th Cir. 1999).

(Doc. 61).

**IT IS FURTHER ORDERED** granting Plaintiff's Motion for Summary Judgment and Contempt (Doc. 64).

**IT IS FURTHER ORDERED** that Horton is found in civil contempt of the August 22, 2025 Order (Doc. 49). Within fourteen days, Pivot shall file a declaration stating its request for reasonable fees and costs arising from Horton's violation; Horton may respond to Pivot's declaration fourteen days after it is filed.

**IT IS FURTHER ORDERED** that a Trial Setting Conference will be held on **Tuesday, November 17 at 10:00 a.m.** via Zoom. The parties will receive connection information by email in advance of the hearing. The parties shall be prepared to discuss whether they will request a bench or jury trial to resolve the amount of Pivot's damages.

Dated this 3rd day of November, 2026.

Honorable Sharad H. Desai
United States District Judge